## COMMONWEALTH *vs.* SAMMY GARCIA.

Middlesex. February 11, 2005. - April 4, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Homicide. Firearms. Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Evidence,* Admissions and confessions, Relevancy and materiality, Motive, Hearsay, State of mind, Prior conviction. *Practice, Criminal,* Capital case, Admissions and confessions, Voluntariness of confession, Motion to suppress, Hearsay, State of mind, Instructions to jury.

The evidence at a hearing on a motion to suppress evidence warranted the judge's conclusion that statements that the criminal defendant had made to police officers before being read his Miranda rights should not be suppressed because the questioning was not custodial at the time, given that the defendant had volunteered to go to the police station, he was not physically restrained, the interview was only for a short period of time and was conversational in manner, and the officers did not communicate to the defendant any subjective suspicions they might have had [831-833]; moreover, the judge did not err in concluding that the defendant's waiver of his Miranda rights was knowing, intelligent, and voluntary, and that his subsequent statements otherwise were voluntary [833].

At a murder trial, the judge did not abuse her discretion in admitting testimony that the defendant did not like members of a certain ethnic group and referred to them in derogatory terms, as such evidence provided an explanation for the reason the defendant targeted the victim; further, the judge did not abuse her discretion in excluding proffered testimony concerning the victim's membership in a gang, as such evidence had no relevance without evidence of knowledge on the defendant's part that the victim was a member of a gang. [834]

At a murder trial, the judge did not err in ruling that otherwise inadmissible hearsay could be introduced in evidence for the limited purpose of showing the defendant's state of mind. [834-835]

No error arose from the prosecutor's introduction, during direct examination of a witness at a criminal trial, of evidence that the witness had been convicted of an offense and had received probation for that offense. [835]

At the trial of indictments charging murder in the first degree and unlawful possession of a firearm, the judge did not err in refusing to instruct the jury on voluntary manslaughter based on heat of passion, where the planning that preceded the shooting precluded the characterization of the shooting as a sudden, impulsive reaction attributable to the heat of the moment [835]; further, the judge did not err in instructing the jury, within the charge on murder committed by deliberate premeditation, that they could

infer malice from the intentional use of a dangerous weapon, as the fact that a dangerous weapon is an object that may cause either serious injury or death did not relieve the Commonwealth of its burden of proving an intent to kill [835-836].

INDICTMENTS found and returned in the Superior Court Department on June 5, 1998.

A pretrial motion to suppress evidence was heard by *Peter M. Lauriat*, J., and the cases were tried before *E. Susan Garsh*, J.

*Donald A. Harwood* for the defendant.

*Loretta M. Lillios*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation[1] and of unlawful possession of a firearm. The trial judge denied the defendant's motion for postconviction relief. Represented by new counsel on appeal, the defendant argues error in (1) the denial of his motion to suppress his statements to the police; (2) certain evidentiary rulings; (3) the judge's refusal to instruct the jury on voluntary manslaughter; and (4) the judge's instruction on malice aforethought. The defendant also argues that we should exercise our power under G. L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt or to order a new trial. We affirm the order denying the defendant's motion to suppress, the judgments of conviction, and the order denying the defendant's motion for postconviction relief. We discern no basis to exercise our authority under G. L. c. 278, § 33E.

The jury could have found the following. On the morning of Thursday, April 16, 1998, a relative of the defendant's, Carlos Berberena, was stabbed by an "Asian" on the premises of Lowell High School. Although the assailant was Asian, there was no indication whether he was Cambodian, Laotian, or Vietnamese. Berberena was admitted to Lowell General Hospital.

That afternoon, the defendant met his girl friend, Maritza Torres, and some other friends, and together they smoked a

[1]The Commonwealth had proceeded on theories of deliberate premeditation and extreme atrocity or cruelty.

"blunt" (a marijuana cigar). Sometime after the defendant left the group, he met up with Wilfredo Jimenez and Alexy Pagan. The defendant was upset about the stabbing. He did not like Cambodians and told Jimenez and Pagan that the "Gooks" or "Cambos" were "going to get theirs," and that he wanted to "buck a Cambo" (shoot a Cambodian). The defendant asked Pagan to get him a "strap" (gun). Later, at a park, Pagan gave the defendant a .380 Smith & Wesson semiautomatic handgun.

In the late afternoon, the defendant contacted Torres, who, together with a friend and Torres's one year old nephew, picked up the defendant, Jimenez, and Pagan in her automobile, a two-door Toyota Celica. They drove to the hospital to visit Berberena. Only the defendant and Torres went in to visit.

Inside a hospital elevator, the defendant told Torres that he had a gun. When they arrived at Berberena's room, there were other visitors there. The defendant leaned over to Berberena and whispered in Berberena's ear that he would "take care" of Berberena and had a "Smith & Wesson."

The defendant and Torres returned to Torres's automobile. Torres drove, and the defendant got into the back seat. As they were driving down School Street, the defendant told Torres to stop the automobile. She complied, and Pagan exited the automobile to let the defendant get out of the back seat. The defendant headed to Cross Street, which intersected School Street, and ducked behind an automobile. The victim, Khedy Leang, was walking nearby. Four gunshots sounded. It was approximately 8:40 P.M.

Shortly after the gunshots sounded, the defendant ran back to School Street and entered Torres's automobile. The defendant stated, "I bucked him four times in the chest." He further explained that he had walked up to an "Asian kid," and asked, "What's up?" The "kid" replied, "What's up?" The defendant shot him and watched him fall to the ground. He then shot the "kid" three more times. The "kid" screamed. During the encounter, the defendant told the "kid," "Say hello to God for me." Torres asked the defendant why he did it, and the defendant replied, "Because of [my] cousin." Torres then drove

everyone home.[2] The defendant told the others that they "didn't see [him]" and to "act normal."

A police officer found the victim, who was thirteen years of age, on his back on the steps of a porch on Cross Street. The officer detected a faint pulse, and observed sounds of gurgling and moaning from the victim. Soon thereafter, the victim died from four gunshot wounds.

On Saturday, April 18, 1998, at approximately 8 P.M., police officers spotted an automobile that was consistent with descriptions of the automobile possibly involved in the murder. The driver was Torres's mother. The police followed her back to her apartment, where they asked Torres if she would go to the police station to answer some questions. Torres agreed. The defendant asked if he could go as well, and an officer told him that he could.

At the police station, the defendant confessed to having killed the victim. The defendant agreed to make a statement that was tape recorded. After doing so, he offered to show the officers where he claimed he had "tossed" the gun, and also showed them where the murder took place. When they returned to the police station, at around 12:30 or 1 A.M., April 19, the police learned for the first time that the defendant was diabetic. One officer asked the defendant if he needed insulin, and the defendant responded that he would need it soon. The police telephoned paramedics, but they refused to administer the insulin Torres had been holding for the defendant because it was contained in an unmarked vial. The police brought the defendant to a nearby medical center where he received an insulin injection from a nurse. The defendant had not exhibited any signs of medical distress before the injection, and his condition did not change after the injection. After the injection, the police transported the defendant back to the police station.

Four .380 caliber discharged cartridge casings were recovered from Cross Street. Four bullets, two recovered from Cross Street, and two from the victim's body, were .380 caliber

___

[2]Pagan accompanied Jimenez to Jimenez's house. That night, Pagan gave the gun that the defendant had used to Jimenez. Sometime later, on a different day, Pagan returned and retook possession of the gun. Pagan had hidden the gun at the house of a friend, Elmer Torres.

projectiles. Police recovered a .380 caliber Smith & Wesson semiautomatic handgun that the defendant's friend, Elmer Torres, had hidden in his home. A ballistics expert testified that, based on comparisons made with the spent bullets and discharged cartridge casings, the .380 caliber Smith & Wesson could not be excluded as the murder weapon.

The defendant did not testify. He called one witness to testify on his behalf, his mother, who stated that the defendant had diabetes and needed two insulin injections each day, one in the morning and the other in the early evening. His main defense was that his statements to police were involuntary because he needed an insulin injection, or because he was under the influence of alcohol and marijuana. For these same reasons, he argued that he could not formulate the requisite deliberate premeditation. The defense also suggested that any murder did not amount to murder in the first degree because only one of the four shots hit the victim in the chest, and the chest wound was not a contact wound. Last, the defendant tried to impeach the credibility of the prosecution's witnesses.

1. *Motion to suppress.* Prior to trial, the defendant moved to suppress the statements he made to the police on April 18, 1998. After an evidentiary hearing, a judge in the Superior Court denied the motion. We summarize the motion judge's findings of fact, with minor additions from uncontested testimony. The findings are supported by the evidence the motion judge found credible, and we accept them. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 656 (2001), and cases cited.

On the date the victim was shot, April 16, 1998, Lowell police officers and State troopers involved in the investigation developed several theories for the killing, including gang feuding or retaliation for a Cambodian youth who had recently been hit in the head with a baseball bat. There had been fighting among "Asian" gangs, and fighting between a specific Cambodian gang and a Hispanic gang.

An officer spoke with a witness who reported having seen a parked Toyota Supra or Celica automobile and, after hearing gun fire, observed a male run into the automobile, which then sped away. The witness provided some detailed observations concerning the automobile, and described the man who ran into

the vehicle. The witness told police that a woman was driving the car, and that there were two passengers inside the vehicle.

On April 18, 1998, Trooper David Burke and Detective Thomas Hultgren established surveillance of an automobile fitting the general description of the suspected vehicle. At approximately 8:55 P.M., they observed a woman enter the automobile. They followed and then stopped the automobile. The driver told them that her daughter, Maritza Torres, owned the vehicle, and that they lived at a nearby address. The police asked if they could speak with Torres. Torres's mother agreed, and allowed the officers to follow her to her residence.

Detective Joseph Thomas Murray and Trooper Joseph Duggan met up with Trooper Burke and Detective Hulgren. Before approaching the apartment, the officers intended to question Torres based on their suspicion that her automobile may have been involved in the shooting. Torres's mother took the officers up to the apartment. Present inside were Torres, her sister, and the defendant. Before the officers met Torres and the defendant in the apartment, their names had not surfaced in the investigation.

Trooper Burke asked Torres if she would come to the police station and answer some questions. Torres agreed. Torres's sister asked if she could come along, and was permitted to do so. The defendant, who appeared calm and responsive, asked if he could go as well, and everyone waited while he put on his shoes.

Trooper Burke transported Torres and the defendant in an unmarked police automobile without a barrier or internal locks. They entered the station through its visitor entrance. The police directed Torres and the defendant into separate interview rooms. The defendant was not physically touched by any officer at this time.

Detective Murray had had previous encounters with the defendant, including an arrest for the illegal possession of a sawed-off shotgun. In connection with that offense, on July 7, 1996, the defendant had waived his Miranda rights.

Detective Murray initially questioned the defendant about Torres's automobile. The defendant was then asked about gang activity at the high school or in his area. The defendant replied

that he had heard of gang activity, but did not know anything about the shooting. Detective Murray asked the defendant what he had been doing on April 16, and the defendant stated that he was at home in bed. This conversation lasted a few minutes. Detective Murray left to confer with Trooper Burke.

Trooper Burke had asked Torres questions concerning her automobile and the incident. Trooper Burke and Detective Murray exchanged information, and discovered that Torres had placed the defendant with her in her automobile during the relevant time frame on April 16. After reentering the interview room, Detective Murray told the defendant that Torres had relayed a different version of what occurred on April 16, and asked the defendant for the truth. The defendant blurted out, "I killed him, if that's what you want to hear." Detective Murray then read the defendant his Miranda rights and, at about 10:05 P.M., the defendant signed a card on which the Miranda rights were printed. The defendant then agreed to talk with Detective Murray. Detective Murray asked the defendant to tell them what he had done. The defendant again confessed, during which time he started sobbing. He continued to cry for a while. He stated that he had thrown the gun off a certain bridge in Lowell. Detective Murray asked if the defendant wanted to make a statement, and the defendant replied affirmatively. Detective Murray asked if he wanted his statement tape recorded, and the defendant stated that he did.

While being taped, the defendant was read his Miranda rights a second time. When asked whether he understood those rights, the defendant answered, "Yes, sir." Detective Murray then asked the defendant if he wanted to talk to them, and the defendant stated, "No." Detective Murray asked, "What's that?" The defendant stated, "No. Oh, I got to talk to you about it?" Detective Murray said, "If you want to still tell us what happened." The defendant stated, "Yeah. I'll tell you everything that happened." Detective Murray then confirmed that the defendant understood his rights. The defendant repeated, "I do want to tell you what happened." The defendant then admitted to randomly picking out a Cambodian youth who looked like he was part of a Cambodian gang, walking up to him, shooting him, and fleeing in Torres's automobile.

During the tape-recorded statement, the defendant began speaking in a low, soft voice until asked to speak up. The defendant's speech was mostly calm and steady throughout the eleven minute tape-recorded interview. Detective Murray observed that the defendant's demeanor became more anxious while he was talking about the actual shooting. Apart from a few sniffles, there was no indication that the defendant was feeling ill during the recorded interview.

Detective Murray had no memory that the defendant suffered from diabetes. The defendant did not disclose his condition to the police, and his actions did not indicate that he needed an insulin shot or was feeling ill.

Approximately one hour after his confession, the defendant agreed to show the officers where he allegedly had thrown the weapon. It was approximately midnight when the showing ended. On the way back to the police station, the defendant offered to point out to the officers where the shooting had occurred. When they arrived at the location, the defendant engaged in a type of reenactment of the shooting.

When they returned to the police station, the officers learned that Torres had a hypodermic needle and insulin in her purse for the defendant. The defendant was asked if he needed an injection, and he stated, "pretty soon." The officers attempted to get emergency medical technicians to administer the shot at the station, but the technicians declined to do so. Consequently, the defendant was taken to a hospital. At this point, the defendant did not appear to be ill or uncomfortable. He walked steadily on his own from the station to the police car, and from the police car to the hospital. The defendant was able to answer questions posed by a nurse concerning his condition and insulin injection amounts. The nurse found the defendant's answers responsive and appropriate. There was no apparent concern by the nurse or doctor that the defendant had not received his insulin sooner. Upon his return to the police station, the defendant was booked. At the time, the defendant was twenty years of age.

a. The motion judge was warranted in concluding that the statements made by the defendant before he was read his Miranda rights should not be suppressed because the questioning was not custodial at that time. The judge correctly applied

the factors set forth in *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984), for determining whether the interrogation had occurred in custodial circumstances. He properly disregarded the defendant's claim that the interrogation was "inherently coercive" because it had occurred at a police station. See *Commonwealth* v. *Gil*, 393 Mass. 204, 212 (1984). In addition, the motion judge correctly noted the factors that would have indicated to a reasonable person, in the defendant's position, that there was no restraint on the defendant's freedom of movement of a degree associated with formal arrest. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 657 (2001). The defendant had volunteered to go to the police station, he was escorted through a visitor's entrance, he was not physically restrained, he was interviewed for only a short period of time and in a conversational manner, and he agreed to wait while the officers conferred concerning the initial questioning of the defendant and Torres. See *Commonwealth* v. *Gil, supra,* and cases cited.

The defendant inappropriately focuses on the second factor set forth in *Commonwealth* v. *Bryant, supra* (whether the investigation has begun to focus on the suspect, including whether there was probable cause to arrest the suspect). That factor was clarified in *Commonwealth* v. *Groome*, 435 Mass. 201, 212 n.13 (2001), which points out that "[t]hat factor has . . . been modified to reflect that an officer's subjective suspicions are relevant to the custody inquiry only if those suspicions have been communicated to the defendant." The officers interviewing the defendant had learned of an inconsistency between the defendant's responses and Torres's answers to their initial questioning. Assuming that this inconsistency could have made the defendant a suspect, it does not automatically render the interview "custodial" for purposes of Miranda. See *Commonwealth* v. *Morse*, 427 Mass. 117, 123 (1998). The motion judge correctly noted that the proper inquiry is to examine the objective circumstances of the situation, not the subjective views of the officers. *Id.* at 123-124. Although Detective Murray informed the defendant that Torres had given a different version of what had occurred on April 16, Detective Murray did not communicate to the defendant that he consequently had become a suspect. See *Commonwealth* v. *Groome, supra.* The motion

judge correctly concluded that a reasonable person in the defendant's position would have felt free to leave.

b. We reject the defendant's contentions that the motion judge erred in concluding that the Commonwealth failed to prove both that his waiver of Miranda rights was knowing, intelligent, and voluntary, and that his statements otherwise were voluntary. See *Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995). The motion judge explained the basis for his conclusions: the defendant was a twenty-year old student at the time of questioning who had previous experience with the criminal justice system, including the recitation and written acknowledgment of his Miranda rights; the defendant's mental state during his interviews was stable; the defendant showed no signs of any physical or mental ailment; the defendant volunteered to go to the police station; the defendant was not threatened, harassed or coerced by the police, nor was he promised any reward for answering their questions. The defendant never invoked his right to counsel after first being informed of his rights under Miranda. The judge's findings and conclusions are fully supported by the evidence.

We add the following observations in response to the contentions raised by the defendant. It was within the motion judge's discretion to discredit, as he implicitly did, the defendant's affidavit containing the assertion that, during questioning, the defendant had had a "diabetic reaction" as a result of not having his insulin shot. See *Commonwealth* v. *Scott*, 430 Mass. 351, 355-356 (1999). Finally, the record does not support the defendant's claim that his waivers were "equivocal." Despite pausing briefly when signing his last name on the back of the card which contained the Miranda warnings, the defendant completed his signature on the waiver card; and despite replying negatively at the outset of his recorded statement, when asked if he wanted to talk to the police officers, the defendant immediately thereafter made it clear to them that he did indeed want to tell them what had happened. This conduct hardly expressed an unwillingness to continue speaking with police that could be "considered tantamount to the exercise of the right to remain silent." See *Commonwealth* v. *Selby*, 420 Mass. 656, 662 (1995). Even if it were, the defendant had confessed prior to the time his statement was recorded.

2. *Evidentiary issues.* We reject the defendant's contention that the trial judge abused her discretion in admitting testimony (over the defendant's objection) from Torres that the defendant did not like Cambodians and referred to them as "Cambos" and "Gooks," while, at the same time, excluding evidence (over the defendant's objection) that the victim belonged to a gang. Torres's testimony was properly admitted because it constituted evidence of the defendant's motive. See *Commonwealth* v. *Mendes*, 441 Mass. 459, 464 (2004). The defendant did not know the victim, and the victim had no connection to Berberena's stabbing. Thus, the evidence provided an explanation for why the defendant targeted this victim. Further, the disputed testimony was admitted with a limiting instruction by the judge.

There was no evidence that the defendant knew that the victim was a gang member. The judge acted within her discretion in excluding the defendant's proffered testimony (during the cross-examination of a police officer) concerning the victim's membership in a gang. See *Commonwealth* v. *Sok*, 439 Mass. 428, 434 (2003); *Commonwealth* v. *Edmonds*, 365 Mass. 496, 502 (1974). Without knowledge on the defendant's part, the evidence had no relevance.

At trial, the defendant considered calling a police officer who had been present at his booking to testify that he (the officer) overheard the defendant state in a telephone call that the victim "flashed his colors" at the defendant (a fact indicating gang membership). The judge ruled that the evidence could come in, but would be limited to the defendant's state of mind and would not be admitted substantively for the truth that the victim did, in fact, "flash[] his colors." Noting that letting in this statement would open the door to other statements made by the defendant on the telephone and overheard by the officer, the defendant chose not to call the officer. There was no error by the judge. The testimony constituted inadmissible hearsay. See *Commonwealth* v. *Eugene*, 438 Mass. 343, 350 (2003).

Contrary to the defendant's assertion, the judge indicated that if the defendant introduced this state of mind evidence (the booking officer's testimony), she would later consider whether the evidence would warrant a voluntary manslaughter instruction. While the defendant chose not to call the booking

officer, evidence was admitted, through the testimony of another police officer, that the defendant had told this other officer that he had recognized the victim as wearing colors. The judge considered this evidence in connection with the defendant's request for a voluntary manslaughter instruction. See *infra*. The booking officer's testimony, even if admitted, would not have required a voluntary manslaughter instruction.

For the first time on appeal, the defendant claims that his rights were violated by the introduction of testimony of Torres that she had been convicted of being an accessory after the fact to the victim's murder, and had received probation for that offense. There was no error. The prosecutor tactically drew out the conviction and probationary sentence during his direct examination to minimize the impact it otherwise likely would have had if the information had initially been elicited by defense counsel. See *Commonwealth* v. *Cadwell*, 374 Mass. 308, 311-312 (1978).

3. *Instruction on voluntary manslaughter.* The defendant contends that the judge erred in refusing to instruct the jury, as he had requested, on voluntary manslaughter based on heat of passion. The defendant argues that the stabbing of Berberena coupled with visiting Berberena in the hospital, and his observation of the victim as "wearing colors" (signifying to him that the victim was a gang member), constituted sufficient evidence to require the instruction. The evidence did not warrant the requested instruction. "Wearing colors" is not "likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint." See *Commonwealth* v. *Curtis*, 417 Mass. 619, 629 (1994), quoting *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980). To the "ordinary person," the color of clothing worn by a complete stranger walking along the street would not produce such a reaction even if it suggests the possibility of gang membership. And, as indicated by the planning that preceded the shooting, some twelve hours after the stabbing of Berberena, the shooting cannot be characterized as a sudden, impulsive reaction attributable to the heat of the moment.

4. *Instruction on deliberate premeditation.* At trial, the defendant's trial counsel objected to the judge's instruction,

within the charge on murder committed by deliberate premeditation, that the jury could infer malice from the intentional use of a dangerous weapon. The defendant argues that the instruction relieved the Commonwealth of proving malice, which, under a theory of deliberate premeditation, requires an intent to cause death. The judge's instruction mirrors that set forth in the Model Jury Instructions on Homicide 7-8, 61 (1999).

There was no error. The fact that a dangerous weapon is an object that may cause either serious injury or death does not relieve the Commonwealth's burden of proving an intent to kill. The language "serious injury" defines what is included by the term "dangerous weapon," but does not define what constitutes the requisite malice. The charge, read as a whole, fairly instructed the jury. See *Commonwealth* v. *Richardson*, 429 Mass. 182, 185 (1999).

5. *G. L. c. 278, § 33E.* We have reviewed the entire record under our statutory obligation, and we discern no basis to grant relief.

6. *Conclusion.* The order denying the defendant's motion to suppress, the judgments of conviction, and the order denying the defendant's motion for postconviction relief are affirmed.

*So ordered.*