## Commonwealth vs. Aaron Powell.

Suffolk. October 7, 2010. - April 28, 2011.

Present: Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.[1]

*Firearms. Practice, Criminal,* Motion to suppress, Assistance of counsel, Standing. *Constitutional Law,* Search and seizure, Reasonable suspicion, Assistance of counsel, Equal protection of laws, Right to bear arms. *Search and Seizure,* Pursuit, Threshold police inquiry, Reasonable suspicion. *Resisting Arrest. Self-Defense. Words,* "Seized."

A Boston Municipal Court judge did not err in denying a criminal defendant's pretrial motion to suppress a firearm dropped to the ground by the defendant as he attempted to climb a fence while in flight from the police, where, at the time the defendant was seized by police (i.e., when one officer drew his weapon, pointed it at the defendant, and ordered him to drop his weapon), they had reasonable suspicion, and also probable cause, that the crime of illegally carrying a firearm had been committed, based on one officer's observation of the defendant removing a previously concealed weapon from his waistband. [577-578]

At the trial of a criminal complaint charging resisting arrest, there was sufficient evidence from which a rational trier of fact could have inferred that the defendant knew that the two men following him were police officers and that he was under arrest, and that the defendant's conduct amounted to resisting arrest. [578-582]

There was no merit to a criminal defendant's argument that the Commonwealth was required, at the trial of a criminal complaint charging possession of an unlicensed firearm, to present evidence that the defendant did not have a license or firearm identification card [582]; further, where it was not the Commonwealth's burden to prove that the defendant did not have a firearms license, and where there was other evidence from which the fact finder could infer consciousness of guilt, defense counsel's failure to file a motion to suppress a statement that was probative of the issue did not constitute ineffective assistance [582-583].

Discussion of recent decisions of the United States Supreme Court concerning the right, under the Second Amendment to the United States Constitution, to keep and bear firearms in one's home for the purpose of self-defense, and the application of that right to the States. [583-586]

A criminal defendant convicted of firearms violations was not precluded from raising for the first time on appeal a constitutional claim that was not available to him until a decision of the United States Supreme Court was issued long after his trial. [586-587]

[1]Justice Cowin participated in the deliberation on this case prior to her retirement.

A criminal defendant could not maintain a constitutional challenge to either G. L. c. 269, § 10 (*h*) (1) (which makes it an offense to own or to possess a firearm without a firearm identification card), or G. L. c. 269, § 10 (*a*) (which makes it an offense to own or to possess a firearm without a license), where he had not attempted to obtain either the identification card or the license. [587-591]

COMPLAINT received and sworn to in the Central Division of the Boston Municipal Court Department on September 22, 2008.

A pretrial motion to suppress evidence was heard by *Mark H. Summerville*, J., and the case was heard by *Michael J. Coyne*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Kathryn Hayne Barnwell* for the defendant.

*Kathleen Celio*, Assistant District Attorney (*Gregory D. Henning*, Assistant District Attorney, with her) for the Commonwealth.

The following submitted briefs for amici curiae:

*Mark G. Mastroianni*, District Attorney, *Jane Davidson Montori*, & *Bethany C. Lynch*, Assistant District Attorneys, for District Attorney for the Hampden County District.

*David M. Skeels*, Committee for Public Counsel Services, & *Peter S. Krupp* for Committee for Public Counsel Services & another.

*Edward F. George, Jr.*, for Gun Owners Action League.

IRELAND, J. On January 30, 2009, after a jury-waived trial in the Central Division of the Boston Municipal Court Department, the defendant, Aaron Powell,[2] was convicted of possession of a firearm[3] without a firearm identification card (FID card), in violation of G. L. c. 269, § 10 (*h*); carrying a loaded firearm without a license, in violation of G. L. c. 269, § 10 (*n*); carrying a firearm without a license, in violation of G. L. c. 269, § 10 (*a*); and

---

[2]At the time of the defendant's trial, he was nineteen years of age. On the date of the offense on which the charges against him are based, the defendant was eighteen years of age.

[3]The term "firearm" is defined in G. L. c. 140, § 121, as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured." The firearm here was a .22 caliber revolver.

resisting arrest, in violation of G. L. c. 268, § 32B.[4] He appeals from the denial of his pretrial motion to suppress evidence,[5] contending that the firearm recovered was the result of an unlawful seizure of his person under art. 14 of the Massachusetts Declaration of Rights.[6] In addition, he contends that there was insufficient evidence to support his convictions of resisting arrest and unlawful possession of a firearm, and that his counsel furnished him with constitutionally ineffective representation by failing to file a motion to suppress a statement made by him. Last, the defendant challenges his firearm convictions under the Second Amendment to the United States Constitution. We transferred the case here on our own motion. We affirm the denial of the defendant's motion to suppress and affirm his convictions.

1. *Motion to suppress.* Prior to trial, the defendant moved to suppress evidence, namely a firearm, that he claimed was the result of an unlawful seizure of his person under both the Fourth Amendment to the United States Constitution and art. 14. After an evidentiary hearing, the motion was denied.

In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002). We summarize the judge's findings of fact, supplemented with uncontested testimony adduced at the evidentiary hearing.[7] See *Commonwealth* v. *Garcia,* 443 Mass. 824, 828 (2005).

---

[4]A charge of assault and battery on a police officer, in violation of G. L. c. 265, § 13D, was dismissed in response to the Commonwealth's request prior to trial.

[5]The motion judge was not the trial judge.

[6]In his motion to suppress, the defendant asserted that his seizure was unlawful under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. On appeal, he advances his argument solely under art. 14.

[7]We "supplement a judge's findings of facts if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony." *Commonwealth* v. *Isaiah I.,* 448 Mass. 334, 337 (2007). Here, the only evidence before the judge was the testimony of Officer Manuel Blas who was called by the prosecution. Based on the judge's findings, it is clear that he implicitly credited Officer Blas's uncontradicted testimony.

On August 20, 2008, at approximately 11 P.M., Boston police Officer Manuel Blas and his partner, Scott Roby, were on routine patrol on Sonoma Street heading toward Maple Street in the Roxbury section of Boston. The officers were in an unmarked Ford Crown Victoria automobile with antennae on the back like those that appear on a marked police cruiser, and as such, are often recognized as an unmarked police cruiser. Officer Roby was driving; Officer Blas was seated in the front passenger seat. Both officers were dressed in plainclothes. Officer Blas wore a badge that identified him as a Boston police officer on a chain around his neck. Officer Roby displayed a badge on his clothing. Officer Blas had responded to that area in the past for calls concerning "shots fired," disturbances, and gun-related offenses.

As the officers approached the intersection, they observed about twenty-five people who were separated into three groups. There were both men and women, and they appeared mainly to be teenagers with a couple of individuals appearing to be in their early twenties. One group was comprised of about ten individuals who were standing in the vicinity of 87 Maple Street, which was to the officers' right. The other two groups were across the street; one consisted of about five individuals and the other of approximately ten individuals.

Officer Roby was driving "very slowly." The windows in the vehicle were down. The officers did not activate any lights or sirens, and did nothing to indicate that they were police. The officers heard yelling between the two groups and saw individuals pointing at each other. It appeared to Officer Blas that an altercation was brewing. While driving between the groups, however, it became "eerily quiet." Officer Blas noticed one young man, the defendant, standing apart from the groups on the 87 Maple Street side of the street.

The defendant was not interacting with any other people, and looked away after he saw the officers. The defendant then walked on the sidewalk toward the officers and through the group congregating at 87 Maple Street. As he started walking, the defendant's right hand moved to his right hip, and his left hand moved to the center of his waist, as if he were grasping something which, based on Officer Blas's experience and training, appeared to be a gun. Once the defendant got past the group, he started to run.

Officer Blas got out of the vehicle and followed the defendant up Sonoma Street. He saw that the defendant was clutching something with his right hand on his right side, with his left hand positioned in the "center right of his waist." The defendant ran to a driveway near a garage. Officer Blas observed that the defendant was holding the handle of what Officer Blas believed to be a gun. As he ran, the defendant, using his right hand, pulled out a firearm, a .22 caliber revolver. Officer Blas held a flashlight in his left hand and drew his gun with his right hand, pointing it at the defendant. Officer Blas twice yelled, "Drop it."

The defendant turned left and ran to a fence along the driveway. As he tried to climb the fence, the defendant dropped the revolver to the ground. Unable to get over the fence, the defendant ran between the fence and a vehicle parked in the driveway in the rear area of the garage. Officer Blas lost sight of the defendant for a few seconds. The defendant emerged from the left side of the driveway, charging at Officer Blas with his hands clutched in fists. Officer Blas moved to his side, and the defendant ran into Officer Roby who had been trailing Officer Blas. The defendant knocked Officer Roby's flashlight out of his hand. Officer Blas placed his gun in his holster and chased the defendant down Sonoma Street. Officer Blas eventually caught up with the defendant when he ran into two armed security guards who worked in the neighborhood. Officer Blas arrested the defendant. Officer Roby secured the revolver dropped by the defendant, which police soon determined to be loaded.

The motion judge made his findings and stated his conclusions orally. He first stated that Officer Blas "had a reasonable and articulable suspicion that the defendant was in possession of a weapon" based on Officer Blas's training and experience, and based on the defendant's actions. The judge concluded that no seizure of the defendant had occurred in the constitutional sense until Officer Blas told the defendant to drop his weapon. At that time, because the defendant had drawn a weapon on Officer Blas, there was "reasonable suspicion [that] became probable cause to arrest." The judge went on to determine that the defendant abandoned his weapon when he tried to climb the fence, and that after its abandonment, the defendant did not retain any

expectation of privacy in the revolver. The judge denied the defendant's motion to suppress.

On appeal, the defendant contends that his seizure was unsupported by reasonable suspicion under art. 14. See note 6, *supra*. In *Commonwealth* v. *Franklin*, 456 Mass. 818, 820 (2010), we stated that whether a seizure has occurred "requires a two-fold determination: whether a seizure has taken place at all and, if so, the precise point in time at which the seizure occurred." We explained that "[a] person is 'seized' by a police officer 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Id.*, quoting *Commonwealth* v. *Barros*, 435 Mass. 171, 173-174 (2001).

We first must determine when the defendant was seized. *Commonwealth* v. *Narcisse*, 457 Mass. 1, 5 (2010). The defendant asserts that his seizure took place when Officer Blas got out of the unmarked police cruiser and pursued him on foot. While there may be instances where a police pursuit is the "functional equivalent" of a seizure, see, e.g., *Commonwealth* v. *Stoute*, 422 Mass. 782, 789 (1996), we have, in *Commonwealth* v. *Franklin*, *supra* at 822, recently "clarified the circumstances in which police pursuit of an individual sufficiently indicates that the person pursued is not free to leave, so that a seizure in the constitutional sense has occurred:"

> "[W]e have held that the police may follow in a cruiser someone whom they observe engage in suspicious conduct to further their investigation, see *Commonwealth* v. *Grandison*, 433 Mass. 135, 138 (2001), and cases cited (following person in cruiser for surveillance purposes without use of blue lights, flashers, or sirens is not seizure), and that following a person, presumably at a rate of speed sufficient to keep him in sight, does not amount to a seizure absent some additional assertion of authority, by direct verbal communication ('stop') or otherwise (blocking, use of flashers). See *Commonwealth* v. *Battle*, 365 Mass. 472, 475 (1974) (when two persons ran into building in 'apparent response' to approaching police car, police 'had the right — if not the duty — to conduct further visual investigation while the two persons remained in public view'). See

also *Commonwealth* v. *Lopez*, [451 Mass. 608, 612 n.2 (2008)] (no seizure where police followed defendant but did not issue any orders, block him from leaving, activate cruiser's blue lights, or pursue him after he rebuffed request to talk)."

This case is similar to *Commonwealth* v. *Franklin, supra* at 819-823. In that case, the defendant's flight was not prompted by anything the police did. When Officer Blas began following the defendant on foot, he had not exercised any show of authority or commanded the defendant to stop; and the officers had not blocked or impeded the defendant's path. It was not until Officer Blas drew his weapon, pointed it at the defendant, and commanded the defendant to "[d]rop it," that a seizure occurred.[8] Just before those actions, the defendant, who appeared to be a youth, had retrieved a firearm from his waist which was visible to Officer Blas, and which the defendant had previously concealed. While "the mere fact of carrying a weapon does not give rise to reasonable suspicion that the person is carrying it unlawfully (because many people register their weapons and carry them lawfully) . . . the fact of concealment of the weapon . . . gives rise to such reasonable suspicion." *Commonwealth* v. *Franklin, supra* at 823 n.3, and cases cited. Thus, at the time Officer Blas commanded the defendant to drop his weapon, Officer Blas, as the police in *Commonwealth* v. *Franklin, supra* at 823, had reasonable suspicion (and also probable cause) that the crime of illegally carrying a firearm had been committed. See *Commonwealth* v. *Sykes*, 449 Mass. 308, 314-315 (2007) (stop of defendant based on reasonable suspicion when, in high crime area where large group had congregated, defendant attempted to avoid contact with police and clenched waistband while he ran). There was no error in denying the motion to suppress.

2. *Sufficiency of the evidence.* In determining the validity of a claim challenging the sufficiency of the Commonwealth's

---

[8]Although we conclude that a seizure was effectuated in this case at this time, our conclusion does not suggest that the police could not earlier have effectuated a seizure of the defendant after they initially observed him concealing a weapon, at which point he fled. The defendant's flight no doubt prevented the police from taking earlier action.

evidence at trial, we review the evidence in the light most favorable to the Commonwealth to determine whether *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979). Circumstantial evidence is sufficient to find a defendant guilty beyond a reasonable doubt and inferences drawn from such circumstantial evidence "need only be reasonable and possible; [and] need not be necessary or inescapable. *Commonwealth* v. *Beckett,* 373 Mass. 329, 341 (1977)." *Commonwealth* v. *Lodge,* 431 Mass. 461, 465 (2000), quoting *Commonwealth* v. *Bush,* 427 Mass. 26, 30 (1998). At the close of the Commonwealth's evidence, the defendant moved for required findings on all charges, but only specified the grounds with respect to the charge of resisting arrest. We examine all of his claims of insufficient evidence, however, because "findings based on legally insufficient evidence are inherently serious enough to create a substantial risk of a miscarriage of justice." *Commonwealth* v. *Grandison,* 433 Mass. 135, 140 n.8 (2001), quoting *Commonwealth* v. *McGovern,* 397 Mass. 863, 867-868 (1986). Because, essentially, the same facts concerning the actions of the defendant and the police officers that were before the motion judge were also brought out at trial, we need not repeat them.

a. *Resisting arrest.* The defendant contends that the trial judge erred in denying his motion for a required finding on the charge of resisting arrest because there was insufficient evidence that (1) the defendant knew that the people chasing him were police; (2) the defendant was under arrest; and (3) the defendant's conduct amounted to resisting arrest. We reject his contentions.

General Laws c. 268, § 32B (*a*), reads in pertinent part:

> "A person commits the crime of resisting arrest if he knowingly prevents or attempts to prevent a police officer, acting under color of his official authority, from effecting an arrest of the actor or another by: (1) using or threatening to use physical force or violence against the police officer or another; or (2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another."

The crime is committed at the time of the effecting of an arrest. *Commonwealth* v. *Grandison, supra* at 145. An arrest is effected where there is (1) "an actual or constructive seizure or detention of the person, [2] performed with the intention to effect an arrest and [3] so understood by the person detained." *Id.*, quoting *Commonwealth* v. *Cook,* 419 Mass. 192, 198 (1994), *S.C.,* 447 Mass. 1023 (2006), and *S.C.,* 451 Mass. 1008 (2008). "In considering whether the person detained understood that he or she was under arrest, we consider 'not what the defendant . . . thought, but what a reasonable [person], innocent of any crime, would have thought in the defendant's shoes.' " *Commonwealth* v. *Quintos Q.,* 457 Mass. 107, 109 (2010), quoting *Commonwealth* v. *Borges,* 395 Mass. 788, 792 n.3 (1985).

Contrary to the defendant's assertion, there was sufficient evidence from which a rational trier of fact, here the trial judge, could have inferred that the defendant knew the two men following him were police officers. Officer Roby was wearing a Boston police badge around his neck on a medallion and a sweatshirt on which a Boston police badge was imprinted and the words "Gang Unit" appeared on a sleeve. The unmarked cruiser that Officers Roby and Blas were driving was recognized in the community as being a vehicle commonly used by police. Because the three groups of people grew silent as the unmarked cruiser neared, it could be reasonably inferred that everyone knew (or at least suspected) that the men inside were police officers. The judge also could have reasonably concluded that the defendant's actions of walking away and then breaking into a run, after the unmarked cruiser passed and the defendant bore witness to the resulting silence, indicated that the defendant, too, understood that the men inside the vehicle were police. Further, Officer Blas's act of drawing his firearm and ordering the defendant to drop his weapon constituted a classic police command, readily understood as such.

We also reject the defendant's contention that there was insufficient evidence that the police wished to do anything other than stop him. In this case, the functional equivalent of a seizure, the first element of an arrest, see *Commonwealth* v. *Stoute,* 422 Mass. 782, 789 (1996), occurred when just after the defendant pulled out a firearm from his waist, Officer Blas drew his firearm,

raised it,[9] and yelled to the defendant, "Drop it," with Officer Roby behind him pointing his gun directly at the defendant. While the officers had followed the defendant (who appeared to be a youth) in view of his actions that indicated, based on their experience and training, that he was concealing a weapon, they did not attempt to seize him until after he actually removed a weapon from his waistband. The pursuit then changed to a "show of authority" illustrated by Officer Blas's command to "[d]rop it," see *Commonwealth* v. *Cook*, *supra* at 199-200, and an attempt forcibly to detain the defendant when the police drew, raised and pointed their weapons at him. Their actions unequivocally indicated they were effecting an arrest of the defendant. See *Commonwealth* v. *Sanderson*, 398 Mass. 761, 766 (1986) (arrest where police "completely imped[ed]" defendant's movement). See also *Commonwealth* v. *Quintos Q.*, *supra* at 111 (arrest may occur even if police do not use word "arrest"); *Commonwealth* v. *Grandison*, *supra* at 145, citing *Commonwealth* v. *Sanderson*, *supra* at 766-767 ("An arrest can occur even if the police do not make a formal arrest"). A reasonable person in the defendant's shoes would not have believed that a young individual could draw a weapon in the presence of police after attempting to conceal that weapon in their presence and evade them, and somehow be free to leave with that weapon despite their command to "[d]rop it," and their attempt to detain that individual by force (at gunpoint). Thus, we conclude that the second and third elements of an arrest are satisfied.

There is no merit to the defendant's argument that there was insufficient evidence that he "resisted" arrest because he was "simply running away," and only made "contact" with Officer Roby because "Roby stepped in his path." Here, there was evidence that the defendant "threaten[ed] to use physical force or violence," G. L. c. 268, § 32B, against Officer Blas when he charged out at him from the darkness of the left side of the driveway (the right side of the garage). The defendant then used "physical force," G. L. c. 268, § 32B, against Officer Roby when he ran into him, knocked his hand, and hit his flashlight

---

[9]At the suppression hearing, Officer Blas testified that he had pointed his gun at the defendant, but at trial he stated he had raised the gun in front of him toward the defendant, but had not been able to point it directly at the defendant "because I was running." The distinction does not alter our conclusion.

out of his hand. There was sufficient evidence from which a rational trier of fact could conclude that the defendant's conduct amounted to "resisting."

b. *Possession of a firearm without a firearm identification card.* The defendant argues that the Commonwealth presented insufficient evidence of possession of an unlicensed firearm because there was no evidence that he lacked a firearms license. He contends that, consequently, his conviction violates the due process clause of the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. We repeatedly have held that in prosecutions under G. L. c. 269, § 10 (*a*) and (*h*), the Commonwealth does not need to present evidence to show that the defendant did not have a license or FID card because the burden is on the defendant, under G. L. c. 278, § 7,[10] to come forward with such evidence. *Commonwealth* v. *Colon*, 449 Mass. 207, 225-226 (2007), quoting *Commonwealth* v. *Tuitt*, 393 Mass. 801, 810 (1985), and *Commonwealth* v. *Jones*, 372 Mass. 403, 406 (1977). In *Commonwealth* v. *Jones*, *supra*, we explained that the absence of a license is not "an element of the crime," as that phrase is commonly used. We went on to conclude that G. L. c. 278, § 7, did not create an unconstitutional presumption because it did not shift to the defendant the burden of proof on an element of the crime. *Id.* at 409. We have declined to revisit these conclusions, see *Commonwealth* v. *Colon*, *supra*, and find no reason to do so now.

3. *Ineffective assistance of trial counsel.* At trial, Officer Blas testified that after handcuffing the defendant, he asked the defendant (without first giving Miranda warnings) why he ran and whether he had a license for the firearm. The defendant replied that he did not have a firearm. The defendant argues that his trial counsel was constitutionally ineffective in failing to file a motion to suppress the defendant's statement in response to Officer Blas. The defendant contends that, had the statement not been in evidence, the Commonwealth could not have met its burden of proof on the licensing element on the charge of pos-

---

[10]General Laws c. 278, § 7, provides that a "defendant in a criminal prosecution, relying for his justification upon a license . . . shall prove the same; and, until so proved, the presumption shall be that he is not so authorized."

session of a firearm without a FID card, and could not have proved consciousness of guilt.

In claims of ineffective assistance of counsel, we examine whether there has been "serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). When, as here, a defendant raises an ineffective assistance argument for the first time on direct appeal instead of in a motion for a new trial, "we will reverse the defendant's convictions only if the ineffectiveness 'appears indisputedly on the trial record.' " *Commonwealth* v. *Medeiros*, 456 Mass. 52, 61 (2010), quoting *Commonwealth* v. *Zinser*, 446 Mass. 807, 811 (2006).

We conclude that even if the defendant's trial counsel had filed a motion to suppress that was allowed, the absence of the statement at the defendant's trial did not likely deprive him of "an otherwise available, substantial ground of defence," *Commonwealth* v. *Saferian, supra.* As previously explained, it was not the Commonwealth's burden to prove that the defendant did not have a firearms license, see *Commonwealth* v. *Jones, supra* at 406. In addition, apart from the defendant's statement, there was other evidence from which the fact finder could infer consciousness of guilt, specifically, the defendant's behavior of attempting to conceal a weapon from the officers as well as evading them while doing so. Most significantly, there was testimony from both officers that they saw the defendant holding a firearm. For these reasons, we conclude that there is no merit to the defendant's claim of ineffective assistance of counsel.

4. *The defendant's Second Amendment claims.* Citing *McDonald* v. *Chicago*, 130 S. Ct. 3020 (2010) (*McDonald*), and *District of Columbia* v. *Heller*, 554 U.S. 570 (2008) (*Heller*), the defendant argues that G. L. c. 269, § 10, and G. L. c. 140, § 131, are unconstitutional per se and as applied to him because they unduly restrict his right to bear arms and right to self-defense under the Second Amendment.[11] For this same reason,

_____

[11]The Second Amendment to the United States Constitution provides: "A

he also contends that the statutes violate his equal protection guarantees under the Federal and State Constitutions.

a. *Overview of* Heller *and* McDonald. In *Heller*, the United States Supreme Court held that the District of Columbia's "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635. In doing so, the Court announced for the first time that the Second Amendment protects an individual right to keep and bear firearms in one's home for the purpose of self-defense, not simply a collective right to possess and carry arms for the purpose of maintaining a State militia. See *id.* at 594-620. The Court characterized this right as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

The Court, however, qualified this right, stating that it is "not unlimited." *Id.* at 626. The Court affirmed its prior precedent saying that the right protected by the Second Amendment involves only the bearing of arms for a lawful purpose, see *id.* at 617-618, and explained, "we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation." *Id.* at 595. In addition, the Court affirmed its prior precedent limiting the Second Amendment's reach with respect to the types of weapons possessed or carried, explaining, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," *id.* at 625, or "the carrying of 'dangerous and unusual weapons,' " *id.* at 627, quoting 4 Blackstone 148-149 (1769). The Court declared that a citizen's Second Amendment right did not prohibit laws regulating who may possess and carry weapons or purchase them, or where such weapons may be carried. The Court explained: "Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifica-

well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."

tions on the commercial sales of arms." *Heller, supra* at 626-627. The Court noted: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26.

In *Heller,* the Court acknowledged that in *United States* v. *Cruikshank,* 92 U.S. 542, 553 (1875) (*Cruikshank*), it held that "the Second Amendment does not by its own force apply to anyone other than the Federal Government." *Heller, supra* at 619. In *Cruikshank, supra,* the Court explained that the Second Amendment "means no more than that [the right to bear arms] shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of the national government . . . ." In *Heller,* the Court took note that in its decisions subsequent to *Cruikshank,* it "reaffirmed that the Second Amendment applies only to the Federal Government." *Heller, supra* at 620 n.23, citing *Presser* v. *Illinois,* 116 U.S. 252, 265 (1886), and *Miller* v. *Texas,* 153 U.S. 535, 538 (1894). The Court stated that the question whether the *Cruikshank* decision remains a continuing bar against application of the Second Amendment to the States was "not presented" to it. *Heller, supra.*

On June 28, 2010, the Court decided *McDonald.*[12] The Court explained that the Second Amendment right to keep and bear arms is "among those fundamental rights necessary to our system of ordered liberty." *McDonald, supra* at 3042. The Court concluded that the right "applies equally to the Federal Government and the States." *Id.* at 3050. The Court, however, was unable to agree on how the Second Amendment right applies to the States. Justice Alito, writing the plurality opinion, concluded that the Second Amendment right is incorporated to the States through the due process clause of the Fourteenth Amendment.

---

[12]In *McDonald* v. *Chicago,* 130 S. Ct. 3020, 3026 (2010) (*McDonald*), the United States Supreme Court considered a Second Amendment challenge to Chicago's firearm laws which "effectively bann[ed] handgun possession by almost all private citizens who reside[d] in the City." The Court explained the procedural history of the case: a Federal District Court judge had rejected the constitutional challenge, noting that in *District of Columbia* v. *Heller,* 554 U.S. 570 (2008) (*Heller*), the Court had refrained from deciding whether the Second Amendment applied to the States. *McDonald, supra* at 3027. The United States Circuit Court of Appeals for the Seventh Circuit affirmed. *Id.* The Court reversed and remanded the case for further proceedings. *Id.* at 3050.

*Id.* In contrast, although he agreed that the Second Amendment is "fully applicable to the States," Justice Thomas concluded that the right "is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause." *Id.* at 3058-3059 (Thomas, J., concurring in part and concurring in the judgment). Of significance, the plurality opinion did not disturb the conclusion in *Heller* that a citizen's rights under the Second Amendment are limited. The Court explained:

> "It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' [*Heller, supra* at 626]. We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' [*Id.* at 626-627.] We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms."

*McDonald, supra* at 3047.

b. *Standing to raise constitutional claims.* The Commonwealth argues that the defendant lacks standing to raise a Second Amendment claim because he did not properly preserve the issue for appeal by filing a pretrial motion, see *Commonwealth* v. *Jasmin*, 396 Mass. 653, 655 (1986), or a motion for a required finding, see *Commonwealth* v. *Oakes*, 407 Mass. 92, 94 (1990). "We have excused the failure to raise a constitutional issue at trial . . . when the constitutional theory on which the defendant has relied was not sufficiently developed at the time of trial . . . to afford the defendant a genuine opportunity to raise his claim." *Commonwealth* v. *Rembiszewski*, 391 Mass. 123, 126 (1984), and cases cited. "When we excuse a defendant's failure to raise a constitutional issue at trial . . . , we consider the issue 'as if it were here for review in the regular course.' " *Id.*,

quoting *Commonwealth* v. *Kater*, 388 Mass. 519, 533 (1983). "If constitutional error has occurred, we reverse the conviction unless the error was harmless beyond a reasonable doubt." *Commonwealth* v. *Rembiszewski, supra.*

The defendant was tried in January, 2009, well before the Court decided the *McDonald* case on June 28, 2010, declaring that the Second Amendment is applicable to the States. *McDonald, supra* at 3050. Significantly, prior to *McDonald*, the Court in *Heller* had not overruled its prior precedent that the Second Amendment applied *only* to the *Federal government. Heller, supra* at 620 n.23. This pre-*McDonald* law, not the law of various circuit courts of the United States Court of Appeals or State courts, was the law to which the defendant was bound at the time of his trial. See *Commonwealth* v. *Runyan*, 456 Mass. 230, 234 (2010), and cases cited. Because the Second Amendment issue now presented by the defendant was not available to him until after *McDonald* was decided, which was long after his trial, we conclude that his failure to raise the issue during his trial does not preclude him from raising it here.

c. *The defendant's firearm convictions and relevant statutory provisions.* (i) *Unlawful possession of a firearm.* General Laws c. 269, § 10 (*h*) (1), makes it an offense to own or to possess a firearm, see note 3, *supra*, in one's home or place of business without obtaining an FID card pursuant to G. L. c. 140, § 129C. See *Commonwealth* v. *Belding*, 42 Mass. App. Ct. 435, 436-437 (1997) (firearm may be legally kept in home or place of residence if possessor has FID card). Under G. L. c. 140, § 129C, an FID card is required of every person, not exempt,[13] who "own[s] or possess[es] any firearm," and must be obtained pursuant to the provisions of § 129B. To avoid prosecution under G. L. c. 269, § 10 (*h*) (1), one must have obtained an FID card from the "licensing authority" in the city or town in which the applicant resides or has a place of business. G. L. c. 140, § 129B (1). An FID card allows the holder to own or possess a firearm within the holder's residence or place of business, but not to carry it to or in any other place. See G. L.

---

[13]General Laws c. 140, § 129C, enumerates numerous "persons and uses" that are exempt from its provisions. The defendant does not argue that he falls under any of these exemptions.

c. 140, § 129C ("The possession of [an FID card] shall not entitle any person to carry a firearm in violation of [G. L. c. 269, § 10]"). See also *Commonwealth* v. *Walker*, 17 Mass. App. Ct. 182, 185 (1983). If an applicant (at the time of submitting an application) is more than fifteen years of age, but less than eighteen, the applicant must submit "a certificate of his parent or guardian granting the applicant permission to apply for [an FID] card." G. L. c. 140, § 129B (1) (vi). Individuals under the age of fifteen may not obtain an FID card. § 129B (1) (v).

(ii) *Unlawful carrying of a firearm.* General Laws c. 269, § 10 (*a*), makes it an offense to "knowingly" possess a firearm outside of one's residence or place of business without also having a license to carry a firearm that has been issued under the licensing provisions of G. L. c. 140, § 131.[14] See *Commonwealth* v. *Seay*, 376 Mass. 735, 742 (1978) (holding that "carrying a firearm within one's residence or place of business by one having a valid [FID] card [but not having a license under G. L. c. 140, § 131,] is not a criminal offense"). General Laws c. 269, § 10 (*n*), provides for an enhanced sentence when the violation of G. L. c. 269, § 10 (*a*), is committed with a loaded firearm. The procedures for obtaining a license to carry a firearm and the conditions of its issuance are contained in G. L. c. 140, § 131. As has been noted, such a license is distinct from an FID card. See *Commonwealth* v. *Walker, supra* (FID card allows holder to possess firearm, but not to carry one). As relevant here, a § 131 license may not be issued to an applicant who "at the time of the application [is] less than [twenty-one] years of age." G. L. c. 140, § 131 (*d*) (iv).

d. *Constitutional challenges.* Although the defendant argues that G. L. c. 269, § 10, and G. L. c. 140, § 131, violate both the Second Amendment and the equal protection guarantees of the Federal and State Constitutions, he contends that the violations occur in the same manner, namely, based on the fact that the statutes allegedly prohibit persons between eighteen and twenty years of age "from having ordinary firearms even in the home." Thus, he claims, the statutes unlawfully deny persons of this age group "from obtaining the same means of self-protection

---

[14]The defendant does not argue that any exemptions to the licensing requirements under G. L. c. 140, § 131, apply to him.

as [adults who are twenty-one years of age]." We confine our-
selves to this basis for his constitutional challenges. See *United
States* v. *Salerno*, 481 U.S. 739, 745 & n.3 (1987) (constitutional
jurisprudence instructs that usually person to whom statute
properly applies will not be heard to challenge statute on
grounds that it conceivably may be unconstitutional as applied
to others). In addition, we review only the statutory provisions
that apply to the defendant. See *Commonwealth* v. *Jackson*, 369
Mass. 904, 908-909 n.3 (1976) (noting that it is appropriate to
refrain from interpreting provisions of statute that do not apply
to defendant's conduct when reviewing defendant's constitutional
challenge to statute).

    *e. Second Amendment challenges.* We note initially that the
defendant overlooks that the right secured by the Second Amend-
ment is not unlimited. Both *Heller* and *McDonald* make that
point clear. See *McDonald, supra* at 3047; *Heller, supra* at 626.
The Court also emphasized in those decisions that the Second
Amendment does not ban all regulation of firearms. See *Mc-
Donald, supra*; *Heller, supra* at 626-627. Rather, the Court only
went so far as to say that the Second Amendment right to keep
and bear arms was infringed on when legislation effectuated a
total ban of handgun possession, or prevented the use of an
operable firearm, in the home. *Heller, supra* at 629-630.

    (i) *Unlawful possession of a firearm in violation of G. L.
c. 269, § 10 (h) (1).* Under G. L. c. 140, § 129B (1) (v), only
individuals under the age of fifteen are prohibited from obtain-
ing an FID card. Significantly, the defendant does not contend
that he ever attempted to obtain an FID card. Cf. *Heller, supra*
at 575 (Heller had applied for and was denied "registration
certificate" to possess handgun in his home). The defendant,
thus, has not demonstrated that a denial of the issuance of an
FID card would have been rendered. Had he been denied an
FID card, his recourse is set forth in G. L. c. 140, § 129B (5)
("Any applicant . . . aggrieved by a denial . . . of [an FID
card] . . . may . . . [ninety] days after receipt of notice of
such denial . . . file a petition to obtain judicial review in the
district court having jurisdiction in the city or town wherein the
applicant filed for . . . such card"). Instead of applying for an
FID card, the defendant chose to violate the law. In these

circumstances, we conclude that he may not challenge his conviction under G. L. c. 269, § 10 (*h*) (1). See *Williams* v. *State*, 417 Md. 479, 488 n.7 (2011) (defendant could not challenge handgun statute where he had not obtained, or even applied for, handgun permit).

(ii) *Unlawful carrying of a firearm in violation of G. L. c. 269, § 10 (a).* With respect to his convictions of unlawfully carrying a loaded firearm, the defendant correctly points out that the licensing scheme, namely the age disqualification in G. L. c. 140, § 131 (*d*) (iv), barring the issuance of a § 131 license to carry to an applicant who "at the time of the application [is] less than [twenty-one] years of age," prohibits young adults between eighteen and twenty years of age from obtaining a § 131 license to carry a firearm. However, as was the case with an FID card, the defendant does not contend that he attempted to obtain a § 131 license to carry. Cf. *Heller, supra.* As a consequence, the defendant has not demonstrated that a denial of the issuance of a § 131 license to him would have been rendered on account of his age alone. We add that under the licensing scheme, had the defendant been denied a § 131 license to carry (for whatever reason), he could have appealed that decision pursuant to the provisions of the statutory licensing scheme. See G. L. c. 140, § 131 (*f*) ("Any applicant . . . aggrieved by a denial . . . of a license . . . may, within either [ninety] days after receiving notice of such denial . . . file a petition to obtain judicial review in the district court having jurisdiction in the city or town wherein the applicant filed for, or was issued, such license"). He chose instead (again) to violate the law. In these circumstances, we conclude that the defendant may not challenge his convictions under G. L. c. 269, § 10 (*a*). See *Williams* v. *State, supra* (defendant could not challenge handgun statute where he had not obtained, or even applied for, handgun permit).

(iii) *Equal protection.* Because the defendant never applied for an FID card or a § 131 license to carry (and was not consequently denied based solely on his age), we need not consider his claim that these provisions violate his Federal and State equal protection rights on account of effecting an age disqualification. We note, however, that *Heller* stands for the proposition

that some categorical bans on firearm possession or use are constitutional, including regulations concerning who may possess a right to keep and bear arms.

5. *Conclusion.* We affirm the denial of the defendant's motion to suppress and affirm his convictions.

*So ordered.*