## Commonwealth *vs.* Liquarry C. Jefferson.
## Commonwealth *vs.* Leslie Burton-Brown.

Suffolk. December 5, 2011. - April 11, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Firearms. Evidence,* Firearm. *License.*

At the trial of complaints charging two defendants with carrying a firearm without a license, possession of ammunition without a firearm identification card, and possession of a loaded firearm, the evidence, viewed as a totality in the light most favorable to the Commonwealth, was sufficient to permit a rational jury to conclude beyond a reasonable doubt that one defendant knew he had a firearm in the vehicle in which the two defendants were traveling, that the other defendant threw the firearm from the front right passenger window of the vehicle, that both defendants knowingly had joint actual or constructive possession or control of the firearm in the vehicle, and that the revolver in question was a firearm within the meaning of G. L. c. 140, § 121. [825-828]

This court reversed the defendants' convictions of carrying a firearm without a license, possession of ammunition without a firearm identification card, and possession of a loaded firearm; set aside the verdicts; and remanded the matter for a new trial, where the judge's erroneous exclusion of certain evidence denied the defendants the opportunity to raise the affirmative defense that the firearm in question was an antique and therefore lawfully could be possessed without a license to carry and relieved the Commonwealth of the burden to rebut this defense in order to prevail at trial; where, given that the defendants failed to provide clear notice in advance of trial of this defense, it would not be fair either to order a judgment of acquittal on the firearm charges or conclude that the defendants had waived this defense; and where, although this defense did not preclude a conviction on the possession of ammunition charge, in the circumstances, a new trial on that charge was necessary to avert a substantial risk of a miscarriage of justice. [828-834]

This court declined to reach the criminal defendants' claim that their convictions of carrying a firearm without a license, possession of ammunition without a firearm identification card, and possession of a loaded firearm implicated their constitutionally protected right to keep and bear arms; moreover, this court concluded that the allocation of burdens under G. L. c. 278, § 7, did not violate one defendant's right to due process, in that the statute only imposed on that defendant the burden to produce some evidence that he was licensed to carry a firearm in order to raise it as an issue at trial, while maintaining the ultimate burden of disproving a properly raised affirmative defense on the prosecution. [834-835]

At a criminal trial, the judge did not err in instructing the jury as to the elements of the crimes charged before the opening statement while saving the remaining instructions for the close of trial, where the judge informed the jury that they would receive further instructions on the law at the conclusion of the case. [835]

At a criminal trial, no substantial risk of a miscarriage of justice arose from the prosecutor's closing argument, which invited the jury to infer that an old firearm might be damaged and a handle might break into pieces if thrown from a speeding vehicle onto a paved walkway, where the argument was grounded in common sense, not expertise, and where the prosecutor did not suggest that he relied on special knowledge not before the jury. [835-836]

COMPLAINTS received and sworn to in the Dorchester Division of the Boston Municipal Court Department on February 23, 2009.

After transfer to the Central Division of the Boston Municipal Court Department, the cases were tried before *Eleanor C. Sinnott*, J.

The Supreme Judicial Court granted applications for direct appellate review.

*Jennifer J. Cox* for Liquarry C. Jefferson.

*Michael A. Waryasz* for Leslie Burton-Brown.

*Cailin Campbell*, Assistant District Attorney, for the Commonwealth.

GANTS, J. After a jury trial in the Central Division of the Boston Municipal Court Department, the defendants, Leslie Burton-Brown and Liquarry Jefferson, were convicted of carrying a firearm without a license, in violation of G. L. c. 269, § 10 (*a*); possession of ammunition without a firearm identification card, in violation of G. L. c. 269, § 10 (*h*); and possession of a loaded firearm, in violation of G. L. c. 269, § 10 (*n*).[1] The defendants appealed, and we granted their applications for direct appellate review. They challenge, among other issues, the sufficiency of the evidence that they possessed the firearm, and

---

[1] Leslie Burton-Brown was also convicted of negligent operation of a motor vehicle, in violation of G. L. c. 90, § 24 (2) (*a*); and failure to stop for the police, in violation of G. L. c. 90, § 25. He was found "not responsible" for speeding, G. L. c. 90, § 17. Charges against each defendant of resisting arrest, in violation of G. L. c. 268, § 32B, were dismissed at the request of the Commonwealth.

they contend that, even if they did, the unlicensed carrying of the firearm was not a crime because the firearm was manufactured before 1900. We conclude that the evidence that the defendants jointly and knowingly possessed the loaded firearm is sufficient as a matter of law. But we also conclude that the judge erred in denying the defendants the opportunity to offer the affirmative defense that the firearm was manufactured before 1900 and therefore could be lawfully possessed without a license to carry, and that this error may have materially influenced the firearm and ammunition convictions. We, therefore, reverse the judgments of conviction on the firearm charges and the ammunition charge as to each defendant, and we remand the cases to the Boston Municipal Court for a new trial on these charges.[2]

*Background.* Because the defendants challenge the sufficiency of the evidence, we describe in detail the evidence at trial viewed in the light most favorable to the Commonwealth. *Commonwealth* v. *Cordle*, 412 Mass. 172, 173-175 (1992). On February 21, 2009, at approximately 11:30 P.M., Officer Dennis Medina and Sergeant James Tarantino of the Boston police department, along with State Trooper William Cameron, were finishing their patrol shift in an unmarked police cruiser in the Dorchester section of Boston when they saw a vehicle fail to stop at a red traffic light. The officers approached the vehicle in their cruiser and turned on the cruiser's police lights and siren to make a traffic stop. The vehicle promptly came to a stop on the side of the road, and the cruiser stopped behind it.

Once Trooper Cameron and Sergeant Tarantino stepped out of the cruiser, the vehicle raced away, the tires "screeching." The officers returned to their cruiser and gave chase. Driving at a high rate of speed, the vehicle made a right turn onto Vinson Street, going up onto the curb and nearly striking a building at the intersection. Vinson Street is a one-way street and the vehicle was moving in the wrong direction. The vehicle did not stop or slow at the intersection, and it continued on to a street named Wellesley Park. Without slowing, the vehicle then took a wide left turn onto Melville Avenue. As the vehicle turned, the cruiser was a few "car lengths" behind, and the pursuing police officers

---

[2]Burton-Brown does not challenge his convictions of negligent operation of a motor vehicle and failure to stop for the police, so those convictions stand.

lost sight of the vehicle for "[n]o more than a couple of seconds." On Melville Avenue the vehicle slowed as it approached the intersection with Dorchester Avenue, made a right turn on Dorchester Avenue that was more controlled than its previous turn, and finally stopped a "couple of blocks" from the intersection with Melville Avenue.

Trooper Cameron left the cruiser, removed the driver (Burton-Brown) from the vehicle, put him on the ground, and handcuffed him. Cameron told Burton-Brown that he was under arrest "because he ran from us." Burton-Brown explained that he had "an open case" and fled because he was scared. When the trooper said he was under arrest just for motor vehicle violations, Burton-Brown's demeanor changed: "He became cocky, kind of like laughing at me . . . ."

The other officers removed the front seat passenger (Jefferson) and the back seat passenger[3] from the vehicle and handcuffed them. The front passenger's side window of the vehicle was "all the way down."[4] Other police officers were called to retrace the path of the chase to search for any items thrown from the vehicle. Approximately ten minutes later, a police team searching with flashlights located a firearm and what appeared to be "broken pieces of plastic," later identified to be part of the firearm's handle, "scattered about" in the middle of a paved walkway leading to the front steps of a house on Melville Avenue, near the corner of Wellesley Park where the defendants' vehicle had earlier made the wide turn while being chased. Although the police had not seen anything being thrown from the vehicle, the location of the firearm was consistent with its having been thrown from the open front passenger's side window when the police lost sight of the vehicle as it turned left onto Melville Avenue. While retracing the path of the vehicle, the police noticed no other pedestrians or other potential source of the firearm. The firearm was in plain view on the walkway, a few feet from the sidewalk. A resident of the house had not seen any firearm around her house or street in the twenty years she lived there.[5]

---

[3]The back seat passenger is not a defendant in this case.

[4]Trooper Cameron described the weather at the time of the stop as "your typical February night"; "[n]o snow, no rain, not bitterly cold or anything like that."

[5]The police, however, did not interview the resident until months later, so

The firearm on the walkway was a Harrington & Richardson .32 caliber five-shot revolver, loaded with three rounds. Forensic testing yielded no recoverable fingerprints on the revolver. Two of the three rounds in the firearm were "struck but not fired," meaning the primer had been struck but the projectile had not discharged from the casing. Detective Martin Lydon of the Boston police department, a firearm and toolmark examiner with the department's firearm analysis unit, tested the operability of the firearm on June 23, 2010. Before he test fired it, Lydon opened the firearm's cylinder to make sure it was safe and that the parts were there. When he did that, three pieces fell out: a firing pin, a firing pin spring, and a "bushing that holds it in." Lydon put the firing pin and spring back into the revolver, then used a small pair of pliers that anyone could purchase to put the bushing in "and twist it about" with a three-quarter turn to secure it, a procedure that "took about a minute." He then loaded the revolver with two rounds of "stock ammunition" and pulled the trigger, intending to fire both rounds into a water tank. The firearm did not discharge on the first two pulls of the trigger, but he "continued pulling the trigger, and the next time the two rounds came around, each one was discharged."[6]

*Discussion.* 1. *Sufficiency of the evidence.* The defendants moved for required findings of not guilty at the conclusion of the prosecution's case under Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979), and renewed their motions under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), after the jury's verdicts. On appeal, the defendants contend that the evidence was insufficient as a matter of law to establish that they were in knowing possession of the loaded revolver that was found on Melville Avenue, or that the revolver met the definition of a firearm under G. L. c. 140, § 121, which requires proof that "a shot or bullet can be discharged" from the revolver.

In evaluating the sufficiency of evidence, we ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in

she had no memory of when she had last been on the walkway leading to her house before the firearm was found there.

[6]On cross examination, Detective Lydon testified that a different Boston police firearm examiner had earlier test fired the weapon on March 17, 2009. The expended round from that test firing was admitted in evidence.

original). *Commonwealth* v. *Marshall,* 434 Mass. 358, 361 (2001), quoting *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979).

While we recognize the issue to be close, we conclude that the evidence was sufficient as a matter of law to support the jury's finding that the defendants jointly and knowingly possessed the loaded revolver. While no recoverable fingerprints were found on the revolver and no one saw anyone throw the firearm from the vehicle during the chase, a jury reasonably could have inferred from the location of the firearm in the middle of the walkway that it had only recently landed there, because it was in such plain view that it would not have remained there for long without being reported or removed. The jury reasonably could have inferred from the broken pieces of the handle found near the revolver that the firearm had hit the ground with enough force for the handle to break into pieces, and that such force was consistent with it being thrown from a moving vehicle. The location of the revolver was also consistent with where it would have landed had it been thrown from the open front passenger's side window of the vehicle at the moment when the police briefly lost sight of it as Burton-Brown made a wide left turn onto Melville Avenue. Because the police officers who retraced the path of the defendants' flight saw no pedestrians or any other apparent source of the weapon, the jury reasonably could have inferred that the firearm had been thrown from the defendants' vehicle during the brief moment in the chase when the vehicle could not be seen from the police cruiser. See, e.g., *Commonwealth* v. *Duncan,* 71 Mass. App. Ct. 150, 154 (2008) (defendants were "only persons in the immediate vicinity" of firearm).

This circumstantial evidence must be considered with other evidence that reasonably permitted the inference that the defendants had thrown some type of contraband from the vehicle during the chase. A rational jury could infer that Burton-Brown sped away for a reason when the police first left their cruiser to approach the vehicle, and that the reason was to throw away contraband that Burton-Brown feared the police would find during a stop. See, e.g., *Commonwealth* v. *Doucette,* 408 Mass. 454, 461 (1990) ("Actions and statements that indicate a defendant's consciousness of guilt, together with other evidence, are

sufficient to prove his guilt"). By initially stopping and racing away only after the police had left the cruiser, Burton-Brown ensured a head start that would provide some separation between the vehicles, and gave the defendants the opportunity to throw the contraband from the vehicle without being seen by the police in the cruiser. If the purpose was to throw contraband from the vehicle without being seen, the time to have done it would have been immediately after the vehicle turned onto another street. Burton-Brown was driving so fast that it would have been difficult for him to throw the contraband out of the window, so it was reasonable to infer that the front seat passenger, whose window was found "all the way down" on that "typical February night," was the person who threw the contraband. The vehicle slowed after turning onto Melville Avenue and came to a stop on Dorchester Avenue, which permits the inference that the contraband had been thrown from the vehicle as it entered Melville Avenue, but that Burton-Brown wanted the inevitable police stop to occur a significant distance away from where the contraband had been discarded.

Burton-Brown's conduct during the traffic stop reasonably suggests that he had discarded contraband during the chase. A reasonable jury could find incredible his explanation that he fled the police because he had "an open case," and could infer that he lied to the police to mask the true reason for his flight. His apparent relief at learning that his arrest was only for motor vehicle violations suggests that he feared something worse.

This evidence, viewed as a totality in the light most favorable to the Commonwealth, would permit a rational jury to conclude beyond a reasonable doubt that Burton-Brown knew that he had a firearm in the vehicle and that Jefferson threw it from the front right passenger window as the vehicle made the turn onto Melville Avenue. It would also permit a rational jury to conclude beyond a reasonable doubt that Burton-Brown and Jefferson knowingly had joint actual or constructive possession or control of the firearm in the vehicle. See *Commonwealth* v. *Sann Than*, 442 Mass. 748, 751 (2004), quoting *Commonwealth* v. *Sespedes*, 442 Mass. 95, 99 (2004) (" 'Constructive possession' requires proof that the defendant had 'knowledge coupled with the ability and intention to exercise dominion and control' ");

*Commonwealth* v. *Acosta*, 416 Mass. 279, 284 (1993), quoting *Commonwealth* v. *Yazbeck*, 31 Mass. App. Ct. 769, 775 (1992) ("Possession 'may be constructive rather than actual; it may be joint and not exclusive; and it may be proved by circumstantial evidence' ").

We also conclude that the evidence is sufficient as a matter of law to support the jury's finding that the revolver was a firearm as defined in G. L. c. 140, § 121, based on Detective Lydon's expert testimony that, after a relatively slight repair with a pair of small pliers, he fired two rounds from the revolver. See *Commonwealth* v. *Bartholomew*, 326 Mass. 218, 220 (1950) ("While it may be conceded that a weapon designed for firing projectiles may be so defective or damaged that it has lost its initial character as a firearm, . . . this character is not lost when a relatively slight repair, replacement, or adjustment will make it an effective weapon"). See also *Commonwealth* v. *Prevost*, 44 Mass. App. Ct. 398, 402-403 (1998) (gun meets statutory definition of firearm where it is capable of firing after replacing broken firing pin with new one).

Therefore, the evidence at trial was sufficient as a matter of law to support a conviction of carrying a firearm without a license, in violation of G. L. c. 269, § 10 (*a*); possession of ammunition without a firearm identification card, in violation of G. L. c. 269, § 10 (*h*); and possession of a loaded firearm, in violation of G. L. c. 269, § 10 (*n*).[7]

2. *"Antique" firearm.* The defendants claim that the motion

_____

[7]To be convicted of unlawful possession of ammunition, the defendant must know that he possessed ammunition. See *Commonwealth* v. *Johnson, ante* 44, 53 (2011); Instruction 7.620 of the Criminal Model Jury Instructions for Use in the District Court (2009). Where, as here, the firearm was a revolver located in a vehicle, a rational jury could infer that those who possessed the firearm knew that it was loaded with ammunition. See *Commonwealth* v. *Elysee*, 77 Mass. App. Ct. 833, 846-848 (2010). However, where, as here, the possession of ammunition charge is based solely on the ammunition found within the firearm, the defendants' convictions of unlawful possession of ammunition and unlawful possession of a loaded firearm, if they were both to be affirmed, would be duplicative, and separate sentences for each crime would violate the double jeopardy clause. *Commonwealth* v. *Johnson, supra* at 54. We do not address here whether, to be convicted of unlawful possession of a loaded firearm, a defendant must know that the firearm he possessed was loaded. See G. L. c. 269, § 10 (*n*) (whoever violates statute prohibiting unlawful carrying of firearm "by means of a loaded firearm . . . shall be further

judge erred in denying their joint motion to dismiss the counts alleging carrying a firearm without a license and possession of a loaded firearm. In that motion, the defendants argued that their firearms expert, Gregory Danas, had determined from the serial number of the revolver that it was manufactured "before 1899," and therefore it was an "antique" that was not a "firearm" as defined in G. L. c. 140, § 121.

Immediately before trial, the prosecutor filed a motion in limine to exclude any evidence offered to show that the firearm was an antique, claiming that whether it was an antique was not material to any potential defense in the case. After the judge declared that a firearm manufactured in 1896 is not an antique under the firearm laws, the defendants argued that the date of manufacture of the firearm would assist the jury in evaluating the qualifications and training of the expert witnesses. The judge granted the Commonwealth's motion, ruling that the word "antique" was not admissible to describe the firearm, but declared that testimony relating to the age and serial number of the firearm was admissible.

At trial, Detective Lydon testified that he did not know when the firearm was manufactured. Danas, the defendants' firearm expert, testified, based on the serial number, that the firearm was manufactured in 1896 and was classified a "collectible gun." When Jefferson's attorney asked Danas if possession of collectible firearms required a license, the judge sustained the Commonwealth's objection.

A firearm manufactured before 1900 is a "firearm" within the definition of G. L. c. 140, § 121, which defines a "[f]irearm" as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured." However, § 121 also provides that the "provisions of [§§] 122 to 129D, inclusive, and [§§] 131, 131A, 131B

punished"); *Commonwealth* v. *Johnson, supra* at 52-53 ("To convict the defendant of unlawful possession of a loaded firearm, the Commonwealth was required to prove that the defendant knowingly possessed a firearm that was loaded with ammunition and met the legal requirements of a firearm as defined by G. L. c. 140, § 121").

and 131E shall not apply to . . . any firearm, rifle or shotgun manufactured in or prior to the year 1899." Because G. L. c. 140, § 131, governs licenses to carry firearms, and because § 131 does not apply to firearms manufactured before 1900, a person does not need a license to carry a firearm made before 1900. The carrying of such an antique firearm, therefore, is exempted by § 131 from the prohibition in G. L. c. 269, § 10 (*a*), against carrying a firearm without a license. See G. L. c. 269, § 10 (*a*) ("Whoever, except as provided or exempted by statute, knowingly has [a firearm] in his possession . . . or . . . under his control in a vehicle" without license to carry firearms issued under G. L. c. 140, § 131, is guilty of crime). As a result, a defendant may not be convicted under § 10 (*a*) of carrying a firearm manufactured before 1900 without a license to carry because the defendant is permitted to carry such an antique firearm without a license to carry.

In allowing the motion in limine, the judge relied on *Commonwealth* v. *Bibby*, 54 Mass. App. Ct. 158, 163 (2002) (*Bibby*), where the Appeals Court found no error in a judge's refusal to allow a defendant to argue to the jury that he would not be in violation of G. L. c. 269, § 10 (*a*), if the firearm he carried was manufactured before 1900. The *Bibby* court held that the argument that a firearm manufactured before 1900 falls outside the scope of § 10 (*a*) "is contrary to the legislative purpose of G. L. c. 269, § 10 (*a*), and the clear and unambiguous language of G. L. c. 140, § 121." *Bibby, supra.* The Appeals Court correctly recognized that the purpose of § 10 (*a*) is "to control the carrying of firearms so as to 'protect the public from the potential danger incident to . . . [their] unlawful possession.' " *Id.*, quoting *Commonwealth* v. *Jackson*, 369 Mass. 904, 911 (1976). But the court failed to recognize that the Legislature also had a valid purpose in exempting firearms manufactured before 1900 from the statute governing the issuance of a license to carry, namely to allow individuals to carry antique firearms to Revolutionary War and Civil War reenactments without requiring them first to obtain a license to carry. By invoking "the clear and unambiguous language of G. L. c. 140, § 121," *id.*, the *Bibby* court appeared to be under the misimpression that § 121 did not exempt firearms manufactured before 1900 from the licensing requirement in G. L. c. 140, § 131.

The *Bibby* court cited in support of its holding an opinion issued by the Attorney General on August 7, 1975, in response to an inquiry from the Commissioner of Public Safety made in anticipation of nonresidents coming to Massachusetts with flintlock or longarm rifles to participate in the Bicentennial Celebration. See *Bibby, supra* at 164 & n.5, citing Rep. A.G., Pub. Doc. No. 12, at 95-96 (1975). The Attorney General in his opinion declared that the license exemptions in G. L. c. 140, § 121, for firearms manufactured before 1899 "allows antique firearms, rifles, or shotguns to be kept at home or in one's place of business without any special permit, license or card being required," but did not exempt such firearms from the prohibition against the *carrying* of firearms in G. L. c. 269, § 10 (*a*).[8] Rep. A.G., Pub. Doc. No. 12, *supra* at 96. When that opinion was written in 1975, however, the statutory exemption in § 121 did not include G. L. c. 140, § 131, which governs the issuance of licenses to carry. Not until 1990 did the Legislature revise § 121 to add § 131 to the list of statutes that "shall not apply" to the older firearms discussed in the Attorney General's 1975 opinion. St. 1990, c. 511, § 1. With that amendment, the reasoning of the Attorney General's opinion now supports the conclusion that firearms manufactured before 1900 may be carried lawfully without a license to carry.[9]

Because of the judge's ruling on the motion in limine, the defendants were denied the opportunity to raise this affirmative defense before the jury and argue that, if the Commonwealth failed to prove that the firearm was manufactured after 1899, the defendants should be found not guilty of the offenses predicated on the unlawful carrying of a firearm. The judge's ruling also meant that the Commonwealth was not required to

---

[8]When the Attorney General offered his opinion in 1975, the relevant exemption in G. L. c. 140, § 121, as appearing in St. 1969, c. 799, § 1, applied to firearms manufactured before 1899. The Legislature in 1998 revised the statute so that the exemption applied to firearms manufactured before 1900. G. L. c. 140, § 121, as appearing in St. 1998, c. 180, § 8.

[9]Under the holding in *Commonwealth* v. *Bibby*, 54 Mass. App. Ct. 158, 163-164 (2002), an owner of a firearm manufactured before 1900 could never bring the firearm to a historical war reenactment, because it is a firearm under G. L. c. 269, § 10 (*a*), and thus requires a license to carry, but he could not obtain a license to carry such a firearm, because the provisions of G. L. c. 140, § 131, "shall not apply" to such a firearm.

rebut this affirmative defense to prevail at trial and, therefore, did not need either to present evidence regarding the manufacturing date of the firearm or to challenge the expert's testimony that the firearm was manufactured in 1896.

Rule 14 (b) (3) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), requires defendants to provide pretrial notice that they intend to rely on a defense of exemption. The defendants here failed to provide clear notice before trial of their defense that, because the firearm was manufactured before 1900, it was exempt from the licensing requirement and may lawfully be carried without a license. Had they done so, the Commonwealth would have had the burden of proving beyond a reasonable doubt that the firearm was not manufactured before 1900 once the defendants met their burden of production through the testimony of their firearm expert that the revolver was manufactured in 1896. Moreover, the defendants here confused the issue by arguing to the motion and trial judges that a firearm manufactured "before 1899" was not a "firearm" under G. L. c. 140, § 121, an argument the judges properly rejected. In these circumstances, it would not be fair to order a judgment of acquittal on the firearm charges where the Commonwealth offered no evidence that the firearm was manufactured after 1899. Nor would it be fair to conclude that the defendants waived this defense where they provided the judge and the Commonwealth with notice in advance of trial of evidence that the firearm was manufactured before 1900 but failed properly to characterize their defense as one of exemption. We conclude that the only fair result here is to reverse the convictions of carrying a firearm without a license and the unlawful possession of a loaded firearm, and remand for a new trial to give the defendants the opportunity to offer evidence of their affirmative defense and the Commonwealth the opportunity to offer evidence in rebuttal.

While firearms manufactured before 1900 are exempt from the licensing requirement in G. L. c. 140, § 131, a defendant may still be convicted of the unlawful possession of ammunition loaded in a firearm manufactured before 1900 if the defendant does not have a firearm identification card and the ammunition does not fall under some exemption. See, e.g., G. L. c. 269,

§ 10 (*h*) (crime to possess ammunition without firearm identification card); G. L. c. 140, § 129C (listing exemptions including "so-called black powder rifles, shotguns, and ammunition therefor"). Therefore, a defendant in possession of a loaded firearm manufactured before 1900 may not be guilty of the unlawful carrying of a loaded firearm, but may still be guilty of the unlawful possession of ammunition. However, we recognize that denying the jury the opportunity to consider the "antique firearm" affirmative defense as to the firearm charges may also have materially influenced their verdicts on the charges of unlawful possession of the ammunition in the firearm. Where, as here, the Commonwealth's evidence that the defendants knowingly possessed the ammunition was not strong but was sufficient as a matter of law, and where acquittals on the firearm charges based on the age of the firearm may have materially affected the jury's verdicts as to the ammunition charges, we conclude that a new trial on the ammunition charge is also necessary to avert a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Purdy*, 459 Mass. 442, 456 (2011); *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). We, therefore, also reverse that conviction as to each defendant and remand for a new trial.

In the future, where a defendant charged with the unlawful carrying of a firearm in violation of § 10 (*a*) possesses evidence that the firearm was manufactured before 1900, the defendant shall provide the Commonwealth with pretrial notice of the affirmative defense of exemption as required by rule 14 (b) (3).[10] See *Commonwealth* v. *Anderson*, 445 Mass. 195, 214 (2005) (statutory exemption "is an affirmative defense"); *Commonwealth* v. *Jones*, 372 Mass. 403, 407 (1977) (treating firearm licensing exclusion as affirmative defense). See also *Commonwealth* v. *Cabral*, 443 Mass. 171, 178-179 (2005), quoting Model Penal Code § 1.12(3)(c) (1985) ("affirmative defense

---

[10]Rule 14 (b) (3) of the Massachusetts Rules of Criminal Procedure, as appearing in 442 Mass. 1518 (2004), provides: "If a defendant intends to rely upon a defense based upon a license . . . or exemption, the defendant shall, within the time provided for the filing of pretrial motions . . . or at such later time as the judge may direct, notify the prosecutor in writing of such intention . . . . If there is a failure to comply[,] a license . . . or exemption may not be relied upon as a defense."

[is] one that 'involves a matter of . . . justification peculiarly within the knowledge of the defendant on which he can fairly be required to adduce supporting evidence' "). Once a defendant gives proper notice to the Commonwealth, the defendant bears the burden of producing evidence of the affirmative defense that the firearm was manufactured before 1900. If such evidence is presented, the burden rests on the prosecution to prove beyond a reasonable doubt that the firearm was manufactured after 1899. See *Commonwealth* v. *Eberhart*, *ante* 809, 813 (2012) (once defendant raises affirmative defense and produces evidence that he had valid license to carry, Commonwealth bears burden of proving he had no valid license); *Commonwealth* v. *Powell*, 459 Mass. 572, 582 (2011), cert. denied, 132 S. Ct. 1739 (2012); *Commonwealth* v. *Colon*, 449 Mass. 207, 226, cert. denied, 552 U.S. 1079 (2007).

3. *Remaining defense claims.* Because we are reversing the firearms and ammunition convictions and remanding for a new trial, we briefly address the remaining defense claims where they may bar a new trial or may recur at a new trial.

a. *Constitutional challenges.* The defendants claim that the Massachusetts statutes governing the licensing of firearms are facially unconstitutional, violate their right to equal protection of law, and impermissibly impinge on their right "to keep and bear arms" under the Second Amendment to the United States Constitution, as recently interpreted by the Supreme Court in *McDonald* v. *Chicago*, 130 S. Ct. 3020 (2010) (*McDonald*), and *District of Columbia* v. *Heller*, 554 U.S. 570 (2008) (*Heller*). We rejected similar challenges in *Commonwealth* v. *Eberhart*, *supra* at 813-814 (right to bear arms), *Commonwealth* v. *Gouse*, *ante* 787, 799-808 (2012) (*Gouse*) (same), *Commonwealth* v. *Loadholt*, 460 Mass. 723, 724-727 (2011) (facial challenge to licensing scheme), *Commonwealth* v. *Powell*, *supra* at 583-586 (right to bear arms; equal protection), and decline to revisit these issues.

Burton-Brown additionally challenges on due process grounds G. L. c. 278, § 7, which requires a defendant in a firearms case whose defense is that he had a license to carry or a firearm identification card to "prove the same." The defendant claims that the statute "impermissibly shifts the burden upon the defendant to prove his innocence." We addressed and rejected this

argument in *Gouse, supra* at 801-808, noting that G. L. c. 278, § 7, only "impose[s] the burden of production on the defendant, maintaining the ultimate burden of disproving a properly raised affirmative defense on the prosecution." *Id.* at 807. As we noted in *Gouse,* "[t]here is no constitutional deficit in this allocation of the burdens." *Id.* See *Gilmore* v. *Taylor,* 508 U.S. 333, 341 (1993) ("States must prove guilt beyond a reasonable doubt with respect to every element of the offense charged, but . . . they may place on defendants the burden of proving affirmative defenses"); *id.* at 351 (O'Connor, J., concurring in the judgment) (defendant "had only the burden of production and not the burden of persuasion; once he produced sufficient evidence for the issue to go to the jury, the State was required to prove the absence of his defense beyond a reasonable doubt"). "Nothing in the *McDonald* and *Heller* decisions has altered or abrogated our jurisprudence regarding the elements of the crime of unlawful possession of a firearm or the allocation of the burdens of production and proof with respect to the affirmative defense of licensure." *Gouse, supra* at 801, citing *Commonwealth* v. *Loadholt, supra* at 726-727.

b. *The judge's preliminary instructions of law.* The defendants claim that the judge erred by preliminarily instructing the jury as to the elements of the crimes charged before the opening statement without also instructing them on the definitions of a firearm, ammunition, and reasonable doubt; on the meaning of possession and knowledge under the law; and on their obligation to consider the evidence separately against each defendant. Where, as here, the judge correctly instructed the jury as to the elements of the crime and informed the jury that they would receive further instructions on the law at the conclusion of the case, the judge committed no error by saving the remaining instructions for the close of trial. See *Commonwealth* v. *Cintron,* 438 Mass. 779, 786 (2003) (preliminary instructions "will be considered along with the judge's final instructions in deciding whether the instructions were correct").

c. *The prosecutor's closing argument.* The defendants contend that the prosecutor's closing argument was improper because he told the jury:

"I submit to you that a handle isn't going to shatter

unless there's some serious force when it hits the ground
. . . . Is it unreasonable to think when the firearm gets
thrown, there might be some pieces that get loose? Is it
unreasonable to think when the firearm gets thrown, the
handle is going to break off into several pieces? I suggest to
you the answer to both of those questions is no."

The defendants assert that, because no expert testified as to the
amount of force that would be needed to break the handle of
the firearm or affect its firing mechanism, these statements were
unsupported by the evidence and suggested that the prosecutor
had personal knowledge regarding the evidence that was not
before the jury. Because the defendants did not object at trial,
we review the alleged error for a substantial risk of a miscar-
riage of justice. *Commonwealth* v. *Vasquez*, 456 Mass. 350,
355-356 (2010).

We conclude that the argument was not improper and posed
no risk of a miscarriage of justice. The prosecutor's argument
"was grounded in common sense, not expertise." *Commonwealth*
v. *Siny Van Tran*, 460 Mass. 535, 555-556 (2011), quoting *Com-
monwealth* v. *Oliveira*, 431 Mass. 609, 613 (2000). The prosecu-
tor did not need expert testimony to invite the jury to infer that
an old firearm might be damaged and a handle might break into
pieces if thrown from a speeding vehicle onto a paved walkway.
Cf. *Commonwealth* v. *Merry*, 453 Mass. 653, 667 n.15 (2009)
("here the jury were equipped to draw their own conclusions").
Nor did the prosecutor suggest that he relied on special knowledge
not before the jury in making this assertion. Contrast *id.* at 666
(prosecutor's closing argument that "we know . . . a person
having a seizure does not sit up" improper as drawing "from
facts not in evidence").

*Conclusion.* The defendants' convictions of carrying a firearm
without a license, possession of ammunition without a firearm
identification card, and possession of a loaded firearm are
reversed, the verdicts are set aside, and the cases are remanded
for a new trial on these charges. Burton-Brown's unappealed
convictions of negligent operation of a motor vehicle and failure
to stop for the police stand.

*So ordered.*