Brassard, Raymond J., J.
On May 26, 2005, a juiy convicted defendant James Gaines (“Gaines”) of armed assault with intent to murder, aggravated assault with a dangerous weapon, and unlawful possession of a firearm. The case is now before the court on Gaines’s motion for a new trial. For the reasons set forth below, the motion is DENIED.[1]
[2]
FINDINGS OF FACT
On April 23, 2012, the court conducted an evidentiary hearing on Gaines’s motion for a new trial. The court received evidence as follows: (1) live testimony; (2) transcripts of the empanelment and sentencing portions of the trial; (3) the recorded interview of retired Justice of the Superior Court Margaret R. Hinkle;[3] and (4) other exhibits. The court heard live testimony from: (1) Attorney Richard Doyle; (2)Willona Gaines; (3) Antwan Jones; (4) Erica Jones; (5) Boston Police Sergeant Detective William Doogan; (6) Boston Police Detective Juan Torres; (7) Court Officer Ronald Bond; and (8) Boston Police Lieutenant Christopher Hamilton.
On the basis of the credible evidence, and inferences reasonably drawn therefrom, the court finds as follows.
I. Juiy Empanelment
Gaines was tried before a juiy with Judge Hinkle presiding from May 13, 2005 to May 27, 2005. Juiy empanelment began on Friday May 13, 2005 in courtroom 906 in the Suffolk County Courthouse. It continued through Monday May 16th and ended sometime on Tuesday May 17th. Judge Hinkle outlined the procedure for jury empanelment as follows:
I’m told by Ms. Sardillo (phonetic) that they will be giving us 96 jurors. So, what we will do, I think, is *241 the following, with assent of the court officers on this, if they agree:
We’ll bring them all in here, and we will do the general questions here, and then we will move the jurors to Judge McDonald’s courtroom, which is right down here, because he’s not here this week, and we’ll just use these two tables right here.
I think that’s the way we’ll do it. We’11 just all seat ourselves around the tables, conduct the individual inquiry. Once the person — which would begin with, “Have you asked” — "answered any of the general questions affirmatively?" and then go through that.
And then whatever individual question I — or questions I decide to be asked will be asked at that point.
Then we’ll ask the prospective juror to step outside with a court officer. Now, I just want to make sure we can do this logistically. And you will exercise your peremptories at that time.
(Tr. 1: 9-10.)
It was not Judge Hinkle’s practice to close the courtroom during any portion of the empanelment process. At some point on May 16, 2005, all available jurors had been questioned, however, additional jurors needed to be selected. (Tr. 2: 135.) Judge Hinkle indicated that a new pool of jurors would not be available until the next day, no earlier than 10 a.m. (Tr. 2: 136.) Judge Hinkle informed all of the selected jurors that they were to report back to court the next morning at 10 a.m. (Tr. 2: 139.) The trial transcript shows that the first order of business on the morning of May 17, 2005 was the additional questioning of two jurors selected the day before. (Tr. 3: 4.)
II. Attorney Richard Doyle
Attorney Richard Doyle (“Attorney Doyle”) represented Gaines at his second trial in May of 2005.[4] At the time, Attorney Doyle had tried approximately fifty juiy trials. He testified that it was his experience that whenever a juiy was being empanelled, the public was not permitted into the courtroom. He stated that oftentimes a sign would be posted in front of the courtroom door telling people not to enter. Further, Attorney Doyle saw no one in the galleiy during juiy empanelment.
However, Attorney Doyle has no actual knowledge as to whether the courtroom was locked during juiy empanelment. He sat with his back to the door and was focused on Gaines and the empanelment process. He also did not check to see if the courtroom doors were locked at any time during juiy empanelment and did not recall seeing a sign indicating that the courtroom was closed. Also, Attorney Doyle did not recall Judge Hinkle issuing an order to close the courtroom.
Furthermore, Attorney Doyle described the juiy empanelment process used by Judge Hinkle. During the individual voir dire, Judge Hinkle arraigned two tables in a “T’ formation. Judge Hinkle sat at the top of the “T’ with the clerk. Attorney Doyle and Gaines sat side by side on the stem of the “T" and Attorney Hallal, the prosecutor for the Commonwealth, was seated across the table. Each prospective juror was then individually brought in through the side door of the courtroom, questioned and sent out of the courtroom. The rest of the prospective juiy pool was seated in another courtroom. Attorney Doyle did not object to the empanelment process.
Lastly, Attorney Doyle remembered meeting Gaines’s family for the first time during the sentencing phase of the trial. Attorney Doyle did not remember any member of Gaines’s family informing him that they were excluded from the courtroom.
III. Willona Gaines
Willona Gaines (“Willona”) is Gaines’s sister. She loves Gaines and would like to see him get out of prison. Willona testified that she was present eveiy day of Gaines’s trial. However, the first day Willona went to court was May 17, 2005. Therefore, Willona was not present for the first two days of juiy empanelment on May 13 and 16, 2005.
Willona testified that she arrived at the courtroom sometime before 10 a.m. on May 17, 2005. She stated that she attempted to pull on the courtroom doors to open them but they were locked. She testified that she was able to look through a crack in the doors and saw people inside but she could not describe them. She stated that she then knocked on the doors. Willona testified that a court officer came to the doors and told her that she could not enter. She could not determine what was going on in the courtroom at the time. She testified that the court officer would not give her a reason as to why she was not allowed into the courtroom.
Willona testified that after she was informed that she could not enter the courtroom, she was outraged and “had like a fit” outside the courtroom. She testified “the court officer made me get out the second hallway to tiy to keep me from disturbing the court.” Willona testified that several other “cops” came over to her and told her that she needed to calm down or she would be removed from the court completely.
Willona testified that later that day she was able to enter the courtroom when Attorney Doyle was giving his opening statement. Willona believed that she told Attorney Doyle that she was not allowed into the courtroom. Lastly, Willona testified that there was one other time that she was not able to enter the courtroom but she could not recall when the incident occurred.
The court does not credit Willona’s testimony that she was excluded from the courtroom on May 17,2005 and on one other occasion. The trial transcripts show that on May 17,2005, court was in session from about 10 a.m. until around 1 p.m. Therefore, it is likely that court would not have been in session when Willona sought entiy before 10 a.m. Further, the court finds *242 that Willona lacks credibility as witness because other relationship to Gaines and because she has a number of prior convictions.[5]
IV.Antwan Jones
Antwan Jones (“Antwan”) is the uncle of Gaines’s two children. Antwan thinks of Gaines as his brother even though the two are not biologically related. Antwan was nineteen years old at the time of Gaines’s second trial. He admitted to having a hard time remembering exactly what occurred. Further, he admitted that he was not good with dates and times.
Antwan stated that he came to court every time Gaines had a court date and was excluded each time. Antwan testified that he was excluded from the courtroom three or four times. He stated that he was asked to leave the courtroom by a court officer. He generally could not give any specific details of times he was excluded from the courtroom. The court finds that Antwan did not come to court every time Gaines had a court date. Gaines’s trial lasted about two weeks, however, Antwan testified that he went to court only three or four times.
Further, Antwan testified that he could remember going to court for Gaines’s sentencing. He stated that he brought Gaines’s three-year-old son with him. A court officer informed him that he had to leave the courtroom but offered no specific explanation. Antwan said, “it was sort of like a we’ll get back to you type of thing. And I was never called back in.” He testified that the courtroom looked packed but he could not tell if there was a seat available for him.
The court does not credit Antwan’s testimony that he was excluded from the courtroom three or four times and that he was not allowed to enter the courtroom during Gaines’s sentencing. The court does not think Antwan was being intentionally untruthful, however, Antwan admitted to having problems with his ability to recall past events.
V.Erica Jones
Erica Jones (“Erica”) is the mother of Gaines’s two children. She is also the sister of Antwan. Erica went to court on two occasions. Each time she went to court she went with Antwan. Erica could not recall what dates she attended Gaines’s trial. She also could not recall what courthouse the trial took place in.
During her direct testimony, Erica stated that the first time she went to Gaines’s trial a court officer told her that she was not allowed into the courtroom. Erica testified that she was not given any reason for why she could not enter. She had no recollection of the date or at what point in the trial this incident occurred. She also had no recollection of what was going on in the courtroom when she was excluded. Erica admitted that Gaines’s trial took place a long time ago and that she did not have a good memory of exactly what had happened.
On cross-examination, Erica stated that the courtroom door was locked the first time she tried to attend court. She stated that she thought it was in the morning. She believed that court was in session because there were a lot of people outside the courtroom, however, she could not see inside the courtroom. Erica testified that the second time she tried to attend court she did not attempt to open the dooi;s. She stated that there were court officers standing outside of the courtroom and that a court officer told her that she was not allowed to enter.
The court does not credit Erica’s testimony that she was denied entry to the courtroom. Erica was unable to provide specific details of the times that she was allegedly excluded from the courtroom. The court does not credit these unspecific allegations. Further, Erica had trouble recalling specific events because of the length of time since the 2005 trial.
VI. Court Officer Ronald Bond
Court Officer Ronald Bond (“Court Officer Bond”) has been a court officer for thirty-two years. In May of 2005, he was assigned to work with Judge Hinkle in courtroom 906. He was the deputy in charge of the session. Court Officer Bond remembered a little of working the Gaines case in May of2005, including the jury empanelment process. Court Officer Bond was interviewed twice by police prior to the hearing. He admitted that at the time of those interviews, he did not recall working Gaines’s second trial. At the hearing, Court Officer Bond had some recollection of working Gaines’s second trial.
It was Court Officer Bond’s policy to have the doors shut but not locked during jury empanelment. He did not recall locking the doors or preventing someone from entering the courtroom during jury empanelment. He also did not recall observing anyone preventing someone from entering the courtroom during jury empanelment.
If the courtroom was full, it was Court Officer Bond’s practice to tell the person seeking entry to the courtroom to wait outside on the bench in the lobby. Also, Court Officer Bond would never lock the doors to the courtroom other than for lunch, recess or at the end of the day.
The court credits the testimony of Court Officer Bond. Even though Officer Bond initially did not have a memory of working Gaines’s second trial, the court credits his knowledge of his general practices.
VII. Boston Police Lieutenant Christopher Hamilton
Boston Police Lieutenant Christopher Hamilton (“Lieutenant Hamilton”) was assigned to the Boston Police Department in May of 2005 and was summonsed to Gaines’s second trial. The first day he attended trial was May 16, 2005. He came to the area outside of courtroom 906 and observed people coming in and out of the courtroom. Further, Lieutenant Hamilton was also present outside of courtroom 906 for the balance of the day on May 17, 2005. He did not *243 see anyone denied entiy to the courtroom. He also he did not see any confrontation due to someone being denied access to the courtroom. He did not see any signs stating that the courtroom was closed. Lieutenant Hamilton was present in the courtroom during sentencing. He thought that the courtroom was full. He said, “you couldn’t fit any more people in there. At least there were no more seats.” The court credits Lieutenant Hamilton’s testimony.
RULINGS OF LAW
A court may grant a motion for a new trial when “it appears that justice may not have been done.” Mass.R.Crim.P. 30(b). The decision of whether to grant the motion is left to the sound discretion of the court. See Commonwealth v. Marrero, 459 Mass. 235, 240 (2011). The court should grant the motion, however, if the “trial was infected with prejudicial constitutional error.” See id. (quoting Commonwealth v. Lucien, 440 Mass. 658, 669-70 (2004)).
Gaines makes two arguments as to why he is entitled to a new trial. First, Gaines argues that his right to a public trial was violated. Second, Gaines contends that the statutory scheme set forth in G.L.c. 269, § 10(h) and G.L.c. 278, §7 violates his Second Amendment right to bear arms. Each argument is discussed below.
I. Right to a Public Trial
Gaines argues that his right to a public trial under the Sixth Amendment of the United States Constitution, as incorporated in the Due Process Clause of the Fourteenth Amendment and Article 12 of the Massachusetts Declaration of Rights, was violated. First, Gaines argues that the trial judge’s procedure for jury empanelment constituted a closed courtroom in the constitutional sense. Second, Gaines contends that several of his family and friends were denied access to the courtroom during various portions of the trial, including jury empanelment.
The closing of a courtroom to the public may implicate the right to a public trial as guaranteed by both the First and Sixth Amendments to the United States Constitution. See Commonwealth v. Cohen, 456 Mass. 94, 106 (2010). There is a “strong presumption in favor of a public trial.” Id. at 107 (quoting Commonwealth v. Baran, 74 Mass.App.Ct. 256, 294 (2009)). That presumption is “overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.” Id. (quoting Press-Enterprise v. Superior Court, 464 U.S. 501, 510 (1984)).
Generally, a defendant’s right to a public trial is not violated absent “some affirmative act by the trial court meant to exclude persons from the courtroom.” Id. at 108 (quoting United States v. Al-Smadi, 15 F.3d 153, 154 (10th Cir. 1994)). However, “a court room may be closed in the constitutional sense without an express judicial order.” Id. The burden “is clearly on the defendant to demonstrate that the public was excluded from his trial.” See id. (quoting Commonwealth v. Williams, 379 Mass. 874, 875 (1980)).
A. Jury Empanelment Procedure
i. Judge Hinkle’s procedure for jury empanelment did not constitute a closed courtroom in the constitutional sense.
The trial transcript indicates that the jury empanelment procedure did not constitute a closed courtroom in the constitutional sense. First, there is no evidence that Judge Hinkle expressly closed the courtroom during the three-day juror empanelment process. Attorney Doyle did not recall Judge Hinkle issuing an order to close the courtroom. Also, Judge Hinkle could not recall any occasion on which she ever closed the courtroom in a criminal trial. While the trial transcript indicates that the jurors were removed from the courtroom after the general questions were asked, there is nothing to indicate this order included the public. Cf. Commonwealth v. Alebord, 80 Mass.App.Ct. 432, 435 (2011) (stating that “venirepersons are not members of the public in the relevant sense”).
Gaines argues that Judge Hinkle ordered the voir dire to be conducted in “private.” Gaines points to the trial transcript where Judge Hinkle instructed the jurors “(t]hen I’m going to ask you some individual questions, in privacy, about the case.” (Tr. 1:20.) However, it is clear that the judge’s use of the word “privacy” was in reference to the jurors being questioned one by one while the rest of the potential jurors were in another courtroom. Cf. Commonwealth v. Greineder, 458 Mass. 207, 227 (2010) (declining to find that the trial judge’s use of the word “non-public” to mean the public was excluded from the voir dire). The procedure outlined by Judge Hinkle indicates that Gaines and the attorneys would be in the courtroom during the individual voir dire and only one juror would be questioned at a time. There is nothing in the trial transcript to indicate that Judge Hinkle meant the word “privacy” to mean that the public was excluded from the courtroom. Therefore, the court does not find that Judge Hinkle’s use of the word “privacy” meant that the public was excluded from the courtroom.[6]
ii. Further, Gaines waived any public trial claims with respect to the jury empanelment procedure.
Even if the jury empanelment procedure constituted a closed courtroom in the constitutional sense, Gaines waived any public trial claims with respect to this procedure. Gaines argues that waiver of his right to a public trial is effective only if he knowingly, voluntarily and intelligently agreed to the closure. See Commonwealth v. Edward, 75 Mass.App.Ct. 162, 173 (2009). Further, he contends that waiver could only occur if he (1) was aware of his public trial right; and (2) understood that the closure implicated the right. See Commonwealth v. Grant, 78 Mass.App.Ct. 450, 458-59 (2010).
While the court agrees that the Edward case and the subsequent line of Appeals Court decisions suggest that public trial claims should be treated differ *244 ently with respect to waiver, the court believes that the Supreme Judicial Court has come to a different conclusion. See Commonwealth v. Dyer, 460 Mass. 728, 734-37 & n.7 (2011). In Dyer, the defendant argued that his Sixth Amendment right was violated when the trial judge conducted individual voir dire in her lobby. See id. at 734. The Supreme Judicial Court found that the defendant’s claim was waived, however, because he failed to preserve the issue through objection at trial. See id. at 735-37. Tellingly, the decision does not contain a discussion of whether the defendant knowingly, intelligently and voluntarily waived his right. Rather, the Court’s analysis is confined to whether the defendant was aware of the closure and capable of objecting to it. See id. at 736-37.
Here, Gaines and Attorney Doyle were present when Judge Hinkle described the jury empanelment procedure and throughout the empanelment process. Neither objected to the procedure at the time of empanelment or during the trial. Therefore, in light of the Dyer decision, Gaines waived his public trial claim with respect to the empanelment procedure because he was aware of the procedure and capable of objecting to it. See id. at 736-37 & n.8.
If a claim has been waived, a court must still grant relief when it is “left with uncertainty that the defendant’s guilt has been fairly adjudicated.” Commonwealth v. Randolph, 438 Mass. 290, 294-95 (2002) (quoting Commonwealth v. Azar, 435 Mass. 675, 687 (2002)). Such error will be evaluated to determine if there is a “substantial risk of a miscarriage of justice.” See id. at 294. To determine if there is a substantial risk of a miscarriage of justice, a court must ask: (1) if there was error; (2) if the defendant was prejudiced by the error; (3) “(cjonsidering the error in the context of the entire trial, would it be reasonable to conclude that the error materially influenced the verdict”; and (4) “(m]ay we infer from the record that counsel’s failure to object or raise a claim of error at an earlier date was not a reasonable tactical decision?” Id at 298.
Gaines argues that the substantial miscarriage of justice standard is not applicable to public trial claims. He contends that violation of the public trial right is a structural error and not susceptible to harmless error analysis. Based on this standard, Gaines argues that once he has demonstrated a violation of his public trial right, he is automatically entitled to relief. The court disagrees.
The Dyer decision makes clear that, despite the structural character of public trial violations, a substantial miscarriage of justice analysis is appropriate. Applying a substantial miscarriage of justice analysis, the Court in Dyer found that the defendant had not been prejudiced by the closure of the courtroom even though the defendant’s right to a public trial may have been violated. Dyer, 460 Mass. at 736-37. The Court stated that using a structural error analysis to evaluate waived claims “would require us to ignore — at great cost to the public interest in the finality of verdicts — the established rule that public trial rights may be waived.” Id at 735 n.7.
Therefore, applying the substantial miscarriage of justice standard, the court finds that Gaines has failed to show he was prejudiced by the jury empanelment procedure. No evidence was produced to suggest that any unfairness occurred as a result of the procedure.
B. Friends and Family Excluded
Further, Gaines argues that his right to a public trial was violated when three friends and family members were excluded from the courtroom at various points throughout the trial. At the hearing, Willona, Antwan and Erica all testified that they were denied entry into the courtroom on a number of occasions during the trial.[7]
The court does not credit these three witnesses’ testimony. First, the witnesses could only provide specific details for two occasions on which they were allegedly denied entry to the courtroom. The court does not credit Willona’s testimony that she was denied entry to the courtroom on the morning of May 17, 2005. Willona testified that she arrived sometime before 10 a.m. and the courtroom doors were locked. However, the trial transcripts show that on May 17, 2005, court was in session from about 10 a.m. until around 1 p.m.. Therefore, it is likely that court would not have been in session when Willona sought entry before 10 a.m.. It was Court Officer Bond’s practice to lock the courtroom while court was not in session.
Further, the court finds that Willona lacks credibility as witness because of her relationship to the defendant and because she has a number of prior convictions. Therefore, based on Willona’s lack of credibility and the trial transcripts, the court finds that Gaines has failed to meet his burden of showing that any member of the public was denied entry to the courtroom during the last day of jury empanelment.
In addition, with respect to Antwan’s testimony that he was not allowed into the courtroom for Gaines’ sentencing, the court also does not credit this allegation.
Even if the court were to credit Antwan’s testimony that he was not allowed into the courtroom during sentencing, the right to a public trial is not violated by insufficient seating to accommodate all spectators. See United States v. Shryock, 342 F.3d 948, 974-75 (9th Cir. 2003), cert. denied, 541 U.S. 965 (2004). In Cohen, the Supreme Judicial Court stated, “to the extent that there were insufficient seats in the court room for all the spectators, excluding those who could not be appropriately seated was permissible.” Cohen, 456 Mass. at 113. In so stating, the Court cited affirmatively to Estes v. Texas, 381 U.S. 532 (1965) (Harlan, J., concurring), and United States v. Shryock, 342 F.3d 948 (9th Cir. 2003).
In Estes, Justice Harlan stated in concurrence:
Obviously, the public trial guarantee is not violated if an individual member of the public cannot gain *245 admittance to a courtroom because there are no available seats ... A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process.
Estes, 381 U.S. at 588-89 (1965) (Harlan, J., concurring). Further, in Shryock, the Ninth Circuit found that the defendants’ Sixth Amendment public trial rights were not violated when there was insufficient seating space in the courtroom that prevented some of the defendants’ family members from attending parts of the trial. Shryock, 342 F.3d at 974-75.
Here, Antwan stated that the courtroom looked full when he attempted to enter prior to sentencing. Further, the court credits Lieutenant Hamilton’s testimony that it was his perception that there were no more seats available in the courtroom during sentencing. Therefore, insofar as Gaines’s family and friends were prevented from attending parts of the trial due to inadequate available seating, Gaines’s right to a public trial was not violated. See Estes, 381 U.S. at 588-89 (1965) (Harlan, J., concurring); Shryock, 342 F.3d at 974-75.
Further, Willona, Antwan and Erica testified that there were a number of other occasions when they were denied entry to the courtroom, however, they were unable to provide specific details. The court does not credit these unspecific allegations. Antwan and Erica admitted that they had trouble recalling specific events because of the length of time since the 2005 trial. Also, Willona did not have a clear recollection of the events surrounding her alleged exclusions from the courtroom. Indeed, Gaines’s trial occurred about seven years ago. These vague allegations based on imprecise memories are not enough to satisfy Gaines’s burden of demonstrating that the courtroom was closed in the constitutional sense. See Cohen, 456 Mass. at 108.
Also, the court does not credit the allegations that the courtroom doors were locked. The court credits the testimony of Court Officer Bond that it was his practice not to lock the courtroom doors during either the general voir dire or the individual voir dire. Further, it was Officer Bond’s practice never to lock the courtroom, other than for lunch, recess or at the end of the day. Also, no witness at the hearing had any memory of seeing a sign indicating that the courtroom was closed.
Additionally, Willona, Antwan and Erica all testified that the court officers gave “no reason” for denying them entry to the courtroom. It is not likely, and therefore not credible, that none of the court officers provided any explanation.
Lastly, Attorney Doyle testified that during the three days of jury empanelment, he did not see anyone in the gallery or anyone come in and out of the main door to the courtroom, which was unusual because it was a high profile case. However, the fact that Attorney Doyle did not see anyone in courtroom during jury empanelment is not dispositive of whether or not the courtroom was closed. See Greineder, 458 Mass. at 229 (“There is no merit to the argument that it is implausible that only a handful of people would have attended voir dire in a case that attracted national attention, and that the only plausible explanation is that the court room was closed to the public”).
Based on the credible evidence presented at the hearing and the trial transcripts, the court finds that neither court officers nor anyone else excluded the public, including Gaines’s friends and family, from the courtroom during the pendency of the trial.
II. Second Amendment
Gaines argues that the statutory scheme set forth in G.L.c. 269, § 10(h) and G.L.c. 278, §7 violates his right to bear arms under the Second Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment Due Process Clause and Part 1, Article 11 of the Massachusetts Declaration of Rights. Further, Gaines contends that the statutory scheme creates a presumption that the defendant must prove his proper licensing, which violates Federal and State due process law.
First, G.L.c. 269, §10(h) does not violate Gaines’s right to bear arms.[8] Relying on the United States Supreme Court decisions in McDonald v. Chicago and District of Columbia v. Heller, Gaines argues that the statute is unconstitutionally burdensome and creates a restriction on the fundamental right to own a handgun. However, the right to bear arms under the Second Amendment is not unlimited. See Commonwealth v. Powell, 459 Mass. 572, 589 (2011). The Supreme Court made clear that the Second Amendment does not ban all regulation of firearms. See McDonald v. Chicago, 130 S.Ct. 3020, 3047 (2010); District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008). Further, the Supreme Judicial Court found that the license requirement of § 10(h) was not unconstitutional on its face. See Commonwealth v. Loadholt, 460 Mass. 723, 726 (2011). Because §10(h) is not a total ban on handgun possession, it is not unconstitutional.[9] See Heller, 554 U.S. at 628-30; see also Powell, 459 Mass. at 589 (stating that the Supreme Court “only went so far as to say that the Second Amendment right to keep and bear arms was infringed on when legislation effectuated a total ban of handgun possession, or prevented the use of an operable firearm, in the home”).
In addition, the statutory scheme does not violate Federal and State due process law.[10] The Supreme Judicial Court has explained, “that the absence of a license is not ‘an element of the crime,’ as that phrase is commonly used.” Powell 459 Mass. at 582 (citing Commonwealth v. Jones, 372 Mass. 403, 409 (1977)). Therefore, G.L.C. 278, §7 does “not create an unconstitutional presumption because it (does] not shift to the defendant the burden of proof on an element of the crime.” Id. As the Supreme Judicial Court has recently affirmed, §7 only “impose(s] the burden of production on the defendant, maintaining the ultimate burden of *246 disproving a properly raised affirmative defense on the prosecution . . . [tjhere is no constitutional deficit in this allocation of the burdens.” Commonwealth v. Jefferson, 461 Mass. 821, 834-35 (2012) (quoting Commonwealth v. Gouse, 461 Mass. 787, 807 (2012)).
ORDER
For the foregoing reasons, Gaines’s motion for a new trial is DENIED.

 On May 28, 2009, Gaines filed a pro se motion for a new trial. On September 8, 2009, Gaines filed a motion to stay adjudication of his motion. In June 2011, Gaines’s stay was granted. The stay was continued in November 2011 pending his appellate counsel’s timely filing of a second motion for a new trial. Because significant time had passed without the filing of the second motion, the court found that the stay was no longer appropriate. On January 10, 2012, the court lifted the stay and denied Gaines’s motion for a new trial (Brassard, J.). Gaines, with the assistance of counsel, filed the current substituted motion for resentencing/new trial on Januaxy 20, 2012. Because the current motion raises new constitutional issues, this court will decide the new issues presented in the motion on the merits. However, the court also stands by its original decision. Therefore, because the court already found: (1) the trial judge did not use an improper factor in sentencing Gaines, and (2) Gaines’s trial counsel was not ineffective, these arguments will not be considered in the current motion.

 Gaines also alleges that the trial judge, Judge Margaret R. Hinkle (“Judge Hinkle”), offered him a plea bargain. He contends that Judge Hinkle punished him for not accepting her plea proposal by imposing a severe sentence. The court stands by its January 10, 2012 decision that Judge Hinkle did not offer Gaines a plea bargain. Furthermore, the trial transcripts do not support these allegations. According to the trial transcripts, there were discussions about the possibility of Gaines pleading guilty during jury empanelment on May 13 and 16, 2005. Attorney Doyle told Judge Hinkle that Gaines would be willing to change his plea to guilty if the committed portion of his sentence would be fifteen years to fifteen years and one day. The trial transcript indicates that a plea had been previously discussed at an earlier lobby conference. Attorney Hallal, prosecutor for the Commonwealth, pulled his notes from the lobby conference. He stated that he had recommended an eighteen-to twenty-year sentence. Attorney Hallal further told Judge Hinkle:
At that time you had indicated and I think you indicated that with respect to looking to wrap up both cases you would be willing to give him a fifteen- to eighteen-year state prison sentence with two to four on and after and then perhaps five years probation. If he was only willing to wrap up the case that’s in front of you now, you indicated, as Mr. Doyle had indicated on Friday, that you may go up a little bit on those numbers, so I think our recommendation is the same.
(Tr. 2: 8). In response, Attorney Doyle indicated that Gaines would want to know exactly what his sentence would be before pleading guilty. Judge Hinkle stated,
But with me he never knows what he’s going to get, never. In other words, I do not indicate unless it’s an agreed-upon plea, in fact I generally, even if it’s an agreed-upon plea, indicate I need to see the probation records and go through the sentencing hearing just in case there’s information that I don’t have. Now, sometimes that’s because I know very, very little about the case, which is essentially the posture we were in at the time that we were at side bar in the so-called lobby conference, but I obviously know more about the case at this juncture than I did . . . about the facts of the case, so I am in that position and also I have some familiarity now, greater than I did before, although not I think a complete familiarity with the prior record in the case, so I would not indicate with certainty under any circumstances that this is the sentence that I am going to impose. It just isn’t my practice to do that.
(Tr. 2:11-12) (emphasis added). However, she informed Gaines that she would be willing to talk about a sentencing range. Attorney Doyle then conferred with Gaines and elected to continue with jury empanelment. Therefore, the record shows that Judge Hinkle did not offer Gaines a plea bargain. She merely informed him of the range that she would likely sentence him within if he pled guilty. As Judge Hinkle stated, it was not her practice to say with certainty what sentence she would impose. Further, there is nothing in the record to suggest that Judge Hinkle punished Gaines for not accepting a plea. During sentencing Jiidge Hinkle stated “I have learned a great deal about the nature of the offense since this trial began two weeks ago today.” Thus, Judge Hinkle had different factors to consider when sentencing Gaines after trial than she had pre-trial and during jury empanelment.

 Judge Hinkle signed an affidavit stating that she listened to her recorded interview and that to the best of her knowledge, the answers she provided to the questions asked of her by the Boston Police Officers were accurate.

 Gaines’s first trial resulted in a mistrial. Attorney Doyle began representing Gaines after his first trial, sometime in the later part of 2004 or the earlier part of 2005.

 Willona admitted that she had been convicted for: (1) manufacturing a class B controlled substance in 1995; (2) manufacturing a class B controlled substance and possession to distribute a class B controlled substance also in 1995; and (3) knowingly receiving stolen properly, larceny and forgery in 2001. The Commonwealth also contends that Willona was convicted in the United States District Court in 2007 for conspiracy to violate the Controlled Substance Act and for distribution of cocaine. Willona, however, did not recall being convicted for conspiracy to violate the Controlled Substance Act. She maintains that she was convicted for unlawful use of communication facilities.

 This is bolstered by the fact that Attorney Doyle states that he never heard Judge Hinkle explicitly close the courtroom to the public and by Judge Hinkle’s statement that she could not recall any occasion on which she ever closed the courtroom in a criminal trial.

 There is no evidence that Gaines or Attorney Doyle were aware of any such exclusion but failed to object.

 General Laws c. 269, §10(h)(1) states: “[w]hoever owns, possesses or transfers a firearm, rifle, shotgun or ammunition without complying with the provisions of section 129C of chapter 140 shall be punished by imprisonment in a jail or house of correction for not more than 2 years or by a fine of not more than $500.”

 In Powell the Supreme Judicial Court found that the defendant could not challenge his conviction under G.L.c. 269, §10(h)(1) because he failed to demonstrate that he ever attempted to obtain a Firearm Identification (“FID”) card, and instead, “chose to violate the law.” See 459 Mass. at 589. Similarly, there is no evidence to suggest that Gaines ever attempted to follow the statutory requirements.

 General Laws c. 278, §7 states “A defendant in a criminal prosecution, relying for his justification upon a license, appointment, admission to practice as an attorney at law, or authority, shall prove the same; and, until so proved, the presumption shall be that he is not so authorized.”